*This opinion is subject to revision before final publication in the Pacific Reporter*

**2024 UT 28**

IN THE

# SUPREME COURT OF THE STATE OF UTAH

PLANNED PARENTHOOD ASSOCIATION OF UTAH, on behalf of itself and its patients, physicians, and staff,
*Appellee,*

*v.*

STATE OF UTAH, GOVERNOR SPENCER J. COX, in his official capacity, ATTORNEY GENERAL SEAN D. REYES, in his official capacity, and MARK B. STEINAGEL, in his official capacity as the Director of the Utah Division of Professional Licensing,
*Appellants.*

No. 20220696
Heard August 8, 2023
Filed August 1, 2024

On Appeal of Interlocutory Order

Third District, Salt Lake County
The Honorable Andrew H. Stone
No. 220903886

Attorneys:*

---

* *Amici curiae*: Victoria S. Ashby, Robert H. Rees, Salt Lake City, for Utah State Legislature; Chaunceton B. Bird, David C. Reymann, Linda Faye Smith, Salt Lake City, for Religious Organizations and Clergy; William C. Duncan, Lehi, for The Sutherland Institute; Thomas R. Lee, John J. Nielsen, James C. Phillips, Salt Lake City, for Pro-Life Utah; Linda Faye Smith, Salt Lake City, for League of Women Voters and Fifty Business Leaders; Frank D. Mylar, Salt Lake City, for American Association of Pro-Life Obstetricians and Gynecologists; Brady Brammer, Pleasant Grove, Julia Payne, Scottsdale, Ariz., for Utah Eagle Forum; William C. Duncan, Lehi, Paul Benjamin Linton, Northbrook, Ill., for Thomas More Society and Family Watch International; David Ferguson, Salt Lake City,

(continued . . .)

Troy L. Booher, J. Frederic Voros, Jr., John Mejia, Salt Lake City, Hannah Swanson, Wash., D.C., Camila Vega, N.Y.C., N.Y., for respondent

Melissa A Holyoak, Solic. Gen., Stanford E. Purser, Deputy Solic. Gen., Lance F. Sorenson, Asst. Att'y Gen., Tyler R. Green, Salt Lake City, Taylor A.R. Meehan, Arlington, Va., for petitioners

---

ASSOCIATE CHIEF JUSTICE PEARCE authored the opinion of the Court, in which JUSTICE PETERSEN, JUSTICE HAGEN, and JUSTICE POHLMAN joined.

CHIEF JUSTICE DURRANT filed a dissenting opinion.

---

ASSOCIATE CHIEF JUSTICE PEARCE, opinion of the Court:

## INTRODUCTION

¶1 Planned Parenthood Association of Utah (PPAU) challenges the law Senate Bill 174 enacted (SB 174). SB 174 prohibits abortion at any stage of pregnancy in all but three circumstances. PPAU contends that SB 174 violates rights the Utah Constitution guarantees. PPAU sought a preliminary injunction halting the law's enforcement while it litigated SB 174's constitutionality. After an evidentiary hearing, the district court entered the injunction.

¶2 The State petitioned for interlocutory review and presents two primary arguments. It first argues that PPAU lacks standing to

---

Farah Diaz-Tello, N.Y.C, N.Y., for If/When/How and Utah Association of Criminal Defense Lawyers; Cheylynn Hayman, David C. Reymann, Salt Lake City, Molly A. Meegan, Kimberly A. Parker, Nathaniel W. Reisinger, Wash., D.C., Jessica E. Notebaert, Bos., Mass., for American College of Obstetricians and Gynecologists, American Medical Association, and Society for Maternal-Fetal Medicine; Julie J. Nelson, Millcreek, Neal Goldfarb, Dillsburg, Pa., for Neal Goldfarb; Alison Satterlee, Salt Lake City, Meha Goyal, Jamie L. Lisagor, Alanna E. Peterson, Seattle, Wash., for Utah Abortion Fund and the National Network of Abortion Funds; Thaddeus W. Wendt, Layton, Christopher E. Mills, Charleston, S.C., for American College of Pediatricians.

assert this challenge. The State next argues that the district court abused its discretion when it granted the preliminary injunction.

¶3 PPAU has standing. PPAU satisfies the requirements for traditional standing and possesses the third-party standing that allows it to advance the claims of its patients.

¶4 The district court acted within its discretion when it granted the preliminary injunction. Because the State asks us to review the grant of a preliminary injunction, we do not decide the merits of PPAU's claims that SB 174 infringes on rights the Utah Constitution protects. Rather, we examine whether the district court abused its discretion when it concluded that PPAU had met the then-existing standard for an injunction. The district court did not.

¶5 PPAU raises serious issues concerning SB 174's constitutionality—and serious issues going to the merits is what Utah Rule of Civil Procedure 65A required when the district court evaluated the motion for a preliminary injunction. The district court did not abuse its discretion when it reviewed the evidence the parties presented and concluded that PPAU would suffer irreparable harm if the law were not enjoined, that the balance of harms tips in favor of an injunction, and that an injunction would not be adverse to the public interest. We affirm the district court and allow the preliminary injunction to remain in place while PPAU litigates its claims.

## BACKGROUND

¶6 Two years before the United States Supreme Court overturned *Roe v. Wade*, 410 U.S. 113 (1973), the Utah Legislature enacted SB 174. *See* Abortion Prohibition Amendments, S.B. 174, 2020 Leg., Gen. Sess. (Utah 2020) (available at https://le.utah.gov/~2020/bills/static/sb0174.html). SB 174

prohibited abortion[1] at any point during a pregnancy, with three exceptions.[2]

¶7     SB 174 provides that any person who performs an unauthorized abortion "is guilty of a second degree felony," which carries the risk of monetary fines and up to fifteen years in prison. *See* UTAH CODE §§ 76-3-301(1)(a), 76-7a-201(3). SB 174 further requires the Department of Health and Human Services (Department) to report physicians who violate the law to the Division of Professional Licensing. *See id.* § 76-7a-201(5). If a violation occurs at an abortion clinic, the Department is instructed to "take appropriate corrective action" against the clinic, "including revoking the abortion clinic's license." *Id.* § 76-7a-201(4).

¶8     The Legislature understood that SB 174 would violate the United States Constitution at the time of its enactment. To address

---

[1] SB 174 defines "abortion" as: (1) "the intentional termination or attempted termination of human pregnancy after implantation of a fertilized ovum through a medical procedure carried out by a physician or through a substance used under the direction of a physician"; (2) "the intentional killing or attempted killing of a live unborn child through a medical procedure carried out by a physician or through a substance used under the direction of a physician"; or (3) "the intentional causing or attempted causing of a miscarriage through a medical procedure carried out by a physician or through a substance used under the direction of a physician." UTAH CODE § 76-7a-101(1). The term does not include the delivery of a stillborn child or the removal of an ectopic pregnancy. *Id.* The Legislature has since amended the statutes SB 174 enacted in ways immaterial to our analysis. We cite the versions in effect when the district court entered the preliminary injunction.

[2] Under SB 174, an abortion is only permitted when: (1) it is "necessary to avert . . . the death of the woman on whom the abortion is performed" or "a serious risk of substantial and irreversible impairment of a major bodily function"; (2) two maternal-fetal medicine physicians confirm in writing that a fetus has either a "uniformly diagnosable and uniformly lethal" condition or a "severe brain abnormality that is uniformly diagnosable"; or (3) the pregnancy is the result of rape or incest and the physician performing the abortion confirms that the assault was reported to law enforcement. UTAH CODE § 76-7a-201.

this, SB 174 contained a "[c]ontingent effective date." *See* Abortion Prohibition Amendments, S.B. 174, 2020 Leg., Gen. Sess. (Utah 2020) (available at https://le.utah.gov/~2020/bills/static/sb0174. html). SB 174 would become law only after the state legislative general counsel certified to the Legislative Management Committee that "a court of binding authority ha[d] held that a state may prohibit the abortion of an unborn child at any time during the gestational period." *Id.*

¶9 The United States Supreme Court thereafter issued *Dobbs v. Jackson Women's Health Organization*, 597 U.S. 215 (2022), which overruled its decisions in *Roe v. Wade*, 410 U.S. 113 (1973), and *Planned Parenthood of Southeastern Pennsylvania v. Casey*, 505 U.S. 833 (1992). The same day the decision issued, the legislative general counsel certified that SB 174 could become effective, informing the Legislative Management Committee that "[b]ecause the United States Supreme Court is a court of binding authority, and because its majority opinion authorizes a state to prohibit the abortion of an unborn child at any time during the gestational period, the contingency required by the Legislature in S.B. 174 has been met."

¶10 PPAU filed a complaint challenging SB 174 the following day. PPAU alleged that SB 174 violates several provisions of the Utah Constitution:

- the right to bodily integrity under article I, sections 1, 7, and 11;

- the right to determine one's own family composition under article I, sections 2, 25, and 27;

- the right to equal protection under Utah's Equal Rights Provision—article IV, section 1;

- the right to the uniform operation of laws under article I, section 24;

- the right of conscience under article I, section 4;

- the right to privacy under article I, sections 1 and 14; and

- the prohibition on involuntary servitude under article I, section 21.

¶11 PPAU requested, and the district court granted, a temporary restraining order preventing the State's enforcement of the new law. PPAU then sought a preliminary injunction.

¶12 In its motion for a preliminary injunction, PPAU first asserted that it had standing to ask the district court to enjoin SB 174. PPAU contended that SB 174 causes it to suffer a "'distinct and palpable injury that gives rise to a personal stake in the outcome of the dispute.'" (Quoting *Sonntag v. Ward*, 2011 UT App 122, ¶ 3, 253 P.3d 1120.) According to PPAU, that injury includes economic harm as well as the threat of criminal prosecution and license revocation. PPAU also claimed it qualifies for third-party standing and can assert the rights of its patients.

¶13 As for the merits of its motion, PPAU argued that it could carry its burden under Utah Rule of Civil Procedure 65A. At the time, a party seeking a preliminary injunction needed to demonstrate that

- "[t]here is a substantial likelihood that [it] will prevail on the merits of the underlying claim, or the case presents serious issues on the merits which should be the subject of further litigation";

- it "will suffer irreparable harm unless the order or injunction issues";

- "[t]he threatened injury to [it] outweighs whatever damage the proposed order or injunction may cause to the party restrained or enjoined"; and

- "[t]he order or injunction, if issued, would not be adverse to the public interest."

UTAH R. CIV. P. 65A(e) (2014).

¶14 PPAU maintained that it had raised serious issues of constitutional significance on six of its claims and was likely to prevail on the merits at trial on these claims.[3]

---

[3] The six claims are:

(1) A "bodily integrity" claim based on the Due Process Clause. *See* UTAH CONST. art. I, § 7.

(continued . . .)

¶15 PPAU asserted that it and its staff would suffer harms that a judgment could not compensate, including the threat of criminal prosecution and license revocation. PPAU added that if SB 174 were enforced, its patients would be denied access to "time-sensitive medical care"—thus resulting in irreparable physical, emotional, and economic harm.

¶16 PPAU claimed that any harm the State would endure because of a preliminary injunction would be "marginal" in comparison to the harms PPAU and its patients would face if the court declined to grant an injunction. It pointed to caselaw suggesting that the "State 'does not have an interest in enforcing a law that is likely constitutionally infirm.'" (Quoting *Chamber of Com. of U.S. v. Edmondson*, 594 F.3d 742, 771 (10th Cir. 2010).) PPAU also questioned the extent to which SB 174 would further the State's expressed interest in preserving life, noting that "Utah already bans nearly all abortions after viability."

¶17 PPAU asserted that an injunction would not be adverse to the public interest because the "public has a substantial interest in an injunction blocking a law that fundamentally upsets the longstanding status quo on which Utah women and their families have relied upon for at least five decades."

¶18 PPAU supported its motion for a preliminary injunction with several declarations.

¶19 Dr. David Turok, PPAU's director of surgical services and a board-certified obstetrician-gynecologist who provides abortions, attested to SB 174's impact on PPAU, its staff, and its patients. Dr. Turok explained that under SB 174, "approximately 2,800 Utahns each year will be forced either to remain pregnant against their will; go out of state for an abortion if they can find the means to do so . . . or attempt to obtain an abortion outside of the medical system."

---

(2) A "family composition" claim guaranteed by various provisions of article I. *See id.* art. I, §§ 2, 25, 27.

(3) A claim under the Equal Rights Provision. *See id.* art. IV, § 1.

(4) A claim under the Uniform Operation of Laws Provision. *See id.* art. I, § 24.

(5) A "freedom of conscience" claim based on the Religious Liberty Provision. *See id.* art. I, § 4.

(6) A privacy claim based on the Search and Seizure Provision. *See id.* art. I, § 14.

Dr. Turok emphasized that this last option "may in some cases be unsafe."

¶20 Dr. Turok further discussed that even "in an uncomplicated pregnancy, an individual experiences a wide range of physiological challenges." He opined that pregnancy "can also exacerbate preexisting health conditions." Dr. Turok explained that pregnancy "may also induce or exacerbate mental health conditions." (First citing Kimberly Ann Yonkers et al., *Diagnosis, Pathophysiology, and Management of Mood Disorders in Pregnant and Postpartum Women*, 117 OBSTETRICS & GYNECOLOGY 961, 963 (2011); and then citing F. Carol Bruce et al., *Maternal Morbidity Rates in a Managed Care Population*, 111 OBSTETRICS & GYNECOLOGY 1089, 1092 (2008).)

¶21 Dr. Turok declared that the "economic impact of forced pregnancy, childbirth, and parenting will also have dramatic, negative effects on Utah families' financial stability." He explained that some "side-effects of pregnancy render patients unable to work" and that "pregnancy-related discrimination can result in lower earnings both during pregnancy and over time." (First citing NAT'L P'SHIP FOR WOMEN & FAMS., BY THE NUMBERS: WOMEN CONTINUE TO FACE PREGNANCY DISCRIMINATION IN THE WORKPLACE 1–2 (2016); and then citing Jennifer Bennett Shinall, *The Pregnancy Penalty*, 103 MINN. L. REV. 749, 787–89 (2018).) Dr. Turok opined that even when a patient qualifies for an abortion under one of SB 174's three exceptions, the paperwork involved "is likely to delay access to care and increase the expense and emotional toll of such a diagnosis."

¶22 Dr. Colleen Heflin, a Ph.D. sociologist, addressed SB 174's impact on women and families with low incomes. Dr. Heflin testified that "to afford an unexpected medical expense such as abortion, poor and low-income women make trade-offs among basic needs." She further explained that "virtually all women throughout Utah will be forced to travel out of state, and, . . . in most instances incurring significantly greater travel-related expenses and logistical burdens than if they could obtain an abortion in their home state." For those women who "could afford travel to another state to obtain an abortion . . . the burden of that travel would force even greater trade-offs in terms of meeting basic needs."

¶23 Dr. Heflin also discussed the costs of not obtaining an abortion, documented in the University of California, San Francisco's "Turnaway Study." She explained that the study found "women who were unable to obtain an abortion were three times more likely to be unemployed six months later, nearly four times more likely to have fallen below 100% of the [federal poverty level], more likely to be receiving public assistance benefits, and more likely to be raising children alone." Dr. Heflin further reported that these "negative consequences to economic well-being were shown to persist four years later compared to women who were able to obtain an abortion." (First citing Diana Greene Foster et al., *Socioeconomic Outcomes of Women Who Receive and Women Who Are Denied Wanted Abortions in the United States*, 108 AM. J. PUB. HEALTH 407, 409, 412–13 (2018); and then citing Sarah Miller et al., *The Economic Consequences of Being Denied an Abortion* 2 (Nat'l Bureau of Econ. Rsch., Working Paper No. 26662, 2022).)

¶24 Lauren Hunt, who sits on the Rape Recovery Center's board of directors, addressed SB 174's impact on sexual assault survivors. Hunt testified that under SB 174, a rape survivor who becomes pregnant is "forced to disclose the rape to law enforcement in order to obtain" an abortion. She further explained that SB 174 requires that "a survivor must disclose their identity, personal contact information, and invasive details about the rape." Hunt asserted that providers "may also feel as though they need to report the assault themselves in order to verify that a report has been made," which "can erode essential trust and transparency between a survivor and the medical provider." Hunt described the risk that an abortion provider who reports an assault under SB 174 may "disclose the patient's private health care information involving abortion."

¶25 In addition, three PPAU patients whose scheduled abortions would have been canceled if the law were not enjoined submitted declarations describing how SB 174 would affect them.

¶26 One patient explained that she would potentially seek an abortion out of state. Another patient described how she would not know where to go if she needed to travel for an abortion and would worry about falling short on rent if she took time off work. The last patient detailed that she would need to find childcare to obtain an abortion out of state, take time off work, and use paid time off that she would typically save to attend her children's doctor's

appointments. Each patient explained that she would not want to challenge SB 174 on her own because of the time and cost involved. And each declarant expressed a desire to remain anonymous throughout any challenge to SB 174.

¶27   The American College of Obstetricians and Gynecologists, the American Medical Association, and the Society for Maternal-Fetal Medicine filed an *amicus* brief in support of PPAU's motion for preliminary injunction. The brief discussed the harm SB 174 poses to pregnant patients' health. For example, it explained that by "removing access to safe, legal abortion, [SB 174] will also increase the possibility that a pregnant patient will attempt self-managed abortions through harmful or unsafe methods." (Citing Rachel K. Jones et al., GUTTMACHER INST., *Abortion Incidence and Service Availability in the United States 2017*, at 3, 8 (2019).) The briefing further asserted that "methods of self-management outside safe medical abortion . . . may rely on harmful tactics such as herbal or homeopathic remedies, intentional trauma to the abdomen, abusing alcohol or illicit drugs, or misusing dangerous hormonal pills." (Citing D. Grossman et al., TEX. POL'Y EVALUATION PROJECT, *Knowledge, Opinion and Experience Related to Abortion Self-Induction in Texas* 3 (2015).)

¶28   The brief also noted that the "narrow exceptions" to SB 174 "fail[] to take into account whether patients experienced issues that threatened their lives or the permanent impairment of a major bodily function during prior pregnancies." This failure would "force" doctors to "let[] a patient deteriorate until one of [SB 174's] narrow exceptions is met," despite the knowledge of a preexisting pregnancy-related condition that "can progress or reoccur if abortion care is not available." The brief asserted that a "pregnant patient's risk of death associated with childbirth is approximately 14 times higher than any risk of death from an abortion." (Citing Elizabeth G. Raymond & David A. Grimes, *The Comparative Safety of Legal Induced Abortion and Childbirth in the United States*, 119 OBSTETRICS & GYNECOLOGY 215, 216 (2012).)

¶29   That *amicus* brief also detailed how SB 174 affects physicians. It opined that SB 174 encroaches on "widely accepted principles of medical ethics" by:

> (1) substituting legislators' opinions for a physician's individualized patient-centered counseling and creating an inherent conflict of interest between

patients and medical professionals; (2) asking medical professionals to violate the age-old principles of beneficence and non-maleficence; and (3) requiring medical professionals to ignore the ethical principle of respect for patient autonomy.

¶30 The brief contended that "the patient-physician relationship is critical for the provision of safe and quality medical care." (Citing AM. COLL. OF OBSTETRICIANS & GYNECOLOGISTS, *Legislative Interference with Patient Care, Medical Decisions, and the Patient-Physician Relationship* (Aug. 2021).) It concluded that SB 174 undermines the patient-physician relationship, thereby undermining "the provision of safe and quality medical care," by creating "inherent conflicts of interest." It further asserted that SB 174 "forces physicians to choose between the ethical practice of medicine—counseling and acting in their patients' best interest—and obeying the law." (Citing AM. MED. ASS'N, *Opinion 1.1.3 – Patient Rights, in* CODE OF MEDICAL ETHICS (2016).)

¶31 PPAU provided the district court with an excerpt from a deposition of a Utah Department of Health and Human Services representative. The deponent testified that she could not recall a single abortion-related death in the State of Utah since she started working at the Department in 2001. The representative testified that in Utah, "between five and ten women a year . . . die as a complication of pregnancy" and that since 1990, "we're actually seeing [] an increase in maternal mortality."

¶32 The State opted not to introduce any evidence of its own in response to PPAU's.[4] It instead challenged PPAU's ability to bring suit. The State claimed that PPAU lacked standing because it has no "personal stake" in the dispute, that its only harm is economic in nature, and that it has no constitutional interest SB 174 implicates.

¶33 As to the merits of PPAU's underlying legal position, the State argued that PPAU had not raised any serious issues on the merits and had no possibility of prevailing on its claims. According to the State, the sections of the Utah Constitution on which PPAU

---

[4] The State did provide the district court with evidence concerning the history of Utah's abortion laws and the potential meaning of the Utah Constitution. *See infra* Part II.A.3.

rested its challenge neither expressly nor impliedly protect the right to choose to have an abortion. The State also contended that no historical evidence exists to support the proposition that the drafters of the Utah Constitution would have considered abortion a right that the constitution protects.

¶34 The State next claimed that PPAU could not show that it would suffer irreparable harm without an injunction because, according to the State, the only harm PPAU raises on its own behalf is a "loss of business." The State further argued that PPAU should be precluded from supporting its application for an injunction with harm non-parties would allegedly suffer. The State did not avail itself of the opportunity to introduce evidence that spoke to the harms PPAU argued it, its staff, and its patients would face if SB 174 were enforced.

¶35 The State asserted that an injunction would impair the State's "strong public interest in the enforcement of valid state statutes" and "the protection of human life, rooted in a moral conviction about the worth of each unborn child." But it did not introduce evidence to support its assertions about SB 174's ability to promote the legislation's goals, nor did it address whether the harms PPAU claimed outweighed the harm to the State. The State contended that "the public interest demands that [SB 174] remain in force" while the court decided the case.

¶36 The court granted PPAU's motion and issued a preliminary injunction enjoining the enforcement of SB 174 pending the final resolution of the case.

¶37 The district court explained that PPAU had "demonstrated an injury in its own right and to its patients" and that "enjoining the Act would redress those injuries." It concluded that PPAU had standing "given its purpose and activities [in] providing reproductive healthcare to women." The court also determined that PPAU "is an appropriate party to litigate this case of significant public import."

¶38 The district court concluded that there were serious issues on the merits that should be the subject of further litigation as to whether SB 174 infringed: (1) a right to make decisions about one's family free from government interference, (2) a right to equal protection, (3) a right to the uniform operation of laws, (4) a right to bodily integrity, (5) a right of conscience, and (6) a right to

privacy. The court made clear that it was "not deciding the merits of [PPAU's] claims at this time," but only that "this case raises novel and complicated issues, and [PPAU] may prevail on one or more of its claims."

¶39 The court determined that PPAU had made a "strong showing that, without a preliminary injunction, [SB 174] will cause irreparable harm to [PPAU], its patients, and its staff." It also found that the balance of harms weighs in PPAU's favor, reasoning that while PPAU, its patients, and its staff "will suffer irreparable harm without a preliminary injunction, it is unclear on this record whether and to what extent [SB 174] will ultimately further its legislative goals." And the court determined that the preliminary injunction would be in the public interest because it would "maintain the status quo" until the constitutional challenges are resolved.

¶40 The State sought interlocutory review. After we granted the State's petition, the Legislature amended Utah Rule of Civil Procedure 65A's preliminary injunction standard to eliminate the "serious issues on the merits" standard. After the amendment, a movant must demonstrate "a substantial likelihood that [it] will prevail on the merits" on at least one of its claims. *See* H.R.J. 2, 65th Leg., Gen. Sess. (Utah 2023). The amendment also allowed a party enjoined by a preliminary injunction on or before February 14, 2023, to "move the court to reconsider [under the modified test] whether the order or injunction should remain in effect." *Id.*

¶41 After that change, this court requested supplemental briefing on whether we should review the district court's decision, which relied on the now outdated standard. In response, the State argued that a decision from this court may "materially affect final resolution of the case and serve the administration and interests of justice." The State stated that it "will not ask the district court to reconsider the existing injunction in the wake of any decision from this Court." In light of the supplemental briefing, we did not rescind the grant of interlocutory review.

## ISSUES AND STANDARDS OF REVIEW

¶42 The State raises two issues. It first argues that the district court erred when it concluded that PPAU had standing to obtain a preliminary injunction. We generally review challenges to standing as a mixed question of fact and law because they involve "the

application of a legal standard to a particularized set of facts." *Hinkle v. Jacobsen*, 2019 UT 72, ¶ 18, 456 P.3d 738 (cleaned up). We defer to the district court's factual determinations but give "minimal discretion to . . . determinations of whether a given set of facts fits the legal requirements for standing." *Id.* (cleaned up).

¶43  The State next contends that the district court abused its discretion when it granted PPAU's request for a preliminary injunction. The decision to grant or refuse an injunction based on a court's consideration of the evidence presented "rests within the discretion of the [district] court." *Hunsaker v. Kersh*, 1999 UT 106, ¶ 6, 991 P.2d 67. We review the district court's decision to grant a preliminary injunction for an abuse of discretion. *See Osguthorpe v. ASC Utah, Inc.*, 2015 UT 89, ¶ 37, 365 P.3d 1201. We will not set aside a district court's conclusion unless it is "so lacking in support as to be against the clear weight of the evidence." *Chen v. Stewart*, 2004 UT 82, ¶ 19, 100 P.3d 1177 (cleaned up), *abrogated on other grounds by State v. Nielsen*, 2014 UT 10, 326 P.3d 645.

¶44  "When district courts have discretion to weigh factors, . . . [or] balance competing interests, . . . those discretionary determinations must rest upon sound legal principles." *State v. Boyden*, 2019 UT 11, ¶ 21, 441 P.3d 737. "Misapplication of the law constitutes an abuse of discretion." *Id.* ¶ 19. When "a legal conclusion is embedded in a district court's discretionary determination, we peel back the abuse of discretion standard and look to make sure that the court applied the correct law." *Id.* ¶ 21. We yield no deference to a district court's legal determinations, reviewing them for correctness. *Osguthorpe*, 2015 UT 89, ¶¶ 36–37.

## ANALYSIS

### I. PPAU HAS STANDING TO CHALLENGE SB 174's CONSTITUTIONALITY

¶45  The State first contends that the district court erred because PPAU lacks standing to challenge SB 174. The State argues that standing "demands more than just a redressable injury." It posits that standing requires a party to show a "personal stake . . . based on its own rights." The State points to *Shelledy v. Lore*, where we adopted the federal rule that generally, "a litigant 'must assert his own legal rights and interests, and cannot rest his claim to relief on the legal rights or interests of third parties.'" 836 P.2d 786, 789 (Utah 1992) (quoting *Warth v. Seldin*, 422 U.S. 490, 499 (1975)).

¶46 Our standing requirements act as a "gatekeeper to the courthouse . . . ensur[ing] that courts confine themselves to the resolution of those disputes most effectively resolved through the judicial process." *Utah Chapter of the Sierra Club v. Utah Air Quality Bd.*, 2006 UT 74, ¶ 17, 148 P.3d 960 (cleaned up). Standing helps the system ensure that a would-be litigant has "the incentive to fully develop all the material factual and legal issues" by showing "a real and personal interest in the dispute." *Id.* ¶ 20 (cleaned up).

¶47 A party generally establishes standing by satisfying the requirements of a "traditional standing test."[5] *Id.* ¶¶ 19–20. Even though the Utah constitution contains no case or controversy clause, this court has adopted a standing test that imposes the same Article III standing requirements the federal courts have used.[6]

_____

[5] Our "traditional standing" requirements mimic those imposed by the United States Supreme Court's interpretation of the federal constitution. Those federal cases may not have much to tell us about standing under the Utah Constitution because the Utah Constitution omits Article III's case or controversy requirement. *See Laws v. Grayeyes*, 2021 UT 59, ¶¶ 77–102, 498 P.3d 410 (Pearce, J., concurring); *In re Gestational Agreement*, 2019 UT 40, ¶ 67, 449 P.3d 69 (Pearce, J., concurring) ("[L]ike numerous other states, we are mindful that our constitution does not impose the same restrictions on our judicial power that the federal constitution imposes on federal courts." (cleaned up) (citing *Gregory v. Shurtleff*, 2013 UT 18, ¶ 16, 299 P.3d 1098)); *see also Jenkins v. Swan*, 675 P.2d 1145, 1149 (Utah 1983) ("[T]he judicial power of the state of Utah is not constitutionally restricted by the language of Article III of the United States Constitution.").

[6] The dissent asserts that since "our state's founding, we have required that plaintiffs show standing as a threshold matter to bring a case in court." *Infra* ¶ 231. But the case it cites for that proposition, *Welsh v. Lambert*, does not speak about standing in the same way the dissent does. 54 P. 975 (Utah 1898). *Welsh* held that a party could not appeal an order that was not final, and we noted that the respondents challenged "the standing of the appellant in this court." *Id.* at 975.

The "traditional" test for standing that we discuss in this opinion is a creature of United States Supreme Court jurisprudence

(continued . . .)

*Compare id.* ¶ 19, *with Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992).[7]

¶48 In addition to the Article III strictures, we have also adopted the federal prudential requirement that a party generally "must assert his own legal rights and interests." *Shelledy*, 836 P.2d at 789 (quoting *Warth*, 422 U.S. at 499). In other words, a plaintiff asserting the rights of third parties must usually satisfy the traditional standing requirements and separately meet the requirements for third-party standing. *Id.; see also Warth*, 422 U.S. at 499.

¶49 To have traditional standing, a party must show "some distinct and palpable injury that gives him a personal stake in the outcome of the legal dispute." *Jenkins v. Swan*, 675 P.2d 1145, 1148 (Utah 1983). This involves a "three-step inquiry." *Sierra Club*, 2006 UT 74, ¶ 19. "First, the party must assert that it has been or will be adversely affected by the challenged actions." *Id.* (cleaned up). "Second, the party must allege a causal relationship between the injury to the party, the challenged actions and the relief requested."

---

that began to take form a couple of decades after we decided *Welsh*. *See* William A. Fletcher, *The Structure of Standing*, 98 YALE L.J. 221, 224–25 (1988). What we have since referred to as the "traditional" standing requirements of a particularized injury and adversariness did not enter our jurisprudence until the mid-20th century. *See Grayeyes*, 2021 UT 59, ¶¶ 88–89 (Pearce, J., concurring) (citing *Lyon v. Bateman*, 228 P.2d 818, 820 (Utah 1951)); *In re Gestational Agreement*, 2019 UT 40, ¶ 60 (Pearce, J., concurring) (citing *Citizens' Club v. Welling*, 27 P.2d 23, 23, 26 (Utah 1933)).

[7] If a party fails to satisfy the traditional test, standing can also be established through the alternative "public interest" standing doctrine. *Gregory*, 2013 UT 18, ¶ 12. Because we conclude that PPAU satisfies the traditional standing test, we offer no opinion on whether it could have public interest standing. Nor do we need to offer an opinion on whether PPAU could assert associational standing. *See, e.g., Utah Chapter of the Sierra Club v. Utah Air Quality Bd.*, 2006 UT 74, ¶ 21, 148 P.3d 960 ("An association . . . has standing if its individual members have standing and the participation of the individual members is not necessary to the resolution of the case.").

*Id.* (cleaned up). "Third, the relief requested must be substantially likely to redress the injury claimed." *Id.* (cleaned up).

¶50 The district court concluded that PPAU established standing under the traditional test. The court explained that PPAU had demonstrated "an injury in its own right," pointing to the "threat of criminal and licensing penalties, reputational harm, and harm to the[] livelihoods" of PPAU and its staff. It also concluded that "enjoining [SB 174] would redress those injuries."

¶51 The State nevertheless argues that traditional standing "demands more than just a redressable injury." It posits that standing instead requires a party to show a "personal stake . . . based on its own rights." This argument conflates traditional standing's requirements with third-party standing's prudential concerns. Traditional standing demands a redressable injury. And the State doesn't really challenge PPAU's ability to meet that threshold.

¶52 Nor could it. PPAU meets each traditional standing requirement. Enforcement of SB 174 subjects PPAU and its physicians to the genuine threat of criminal prosecution and licensing penalties if it provides the abortion care that SB 174 prohibits. *See* UTAH CODE § 76-7a-201(4)–(6); *cf. Brown v. Div. of Water Rts. of the Dep't of Nat. Res.*, 2010 UT 14, ¶ 19, 228 P.3d 747 ("[A] plaintiff seeking standing on the basis of a claim of future injury must, at a minimum, set forth allegations establishing that a reasonable probability, as opposed to a mere possibility, of future injury exists."). PPAU additionally demonstrated the probability of reputational harm arising from the impact of SB 174 on PPAU's ethical obligations as a medical provider.

¶53 PPAU also presented evidence of economic harm. PPAU explained that SB 174 prevents it from providing treatment to patients, requires the cancellation of existing appointments, and threatens licensing penalties for noncompliance. *Cf. Sierra Club*, 2006 UT 74, ¶¶ 22–23 (finding that "adverse[] impact [to plaintiff's] livelihoods" satisfied the first standing requirement). In sum, SB 174 regulates PPAU, and the threatened injuries are more than sufficient to demonstrate an individualized injury for traditional standing. *See Jenkins*, 675 P.2d at 1151 (a party who "is or is likely to be subject to prosecution" may show a "personal adverse impact" that could satisfy the traditional test for standing).

¶54 PPAU likewise demonstrated that it could meet the causation and redressability prongs of the traditional standing test. PPAU showed that the harm it will suffer, whether it is direct harm such as criminal and licensing penalties, or indirect harm to PPAU's reputation or livelihood, both arise directly from SB 174. *See* UTAH CODE § 76-7a-201(3)–(4). Put differently, PPAU must either comply with SB 174, "thereby incurring a direct economic injury" or it may "disobey the statutory command and suffer . . . sanctions and perhaps loss of license." *Craig v. Boren*, 429 U.S. 190, 194 (1976) (cleaned up). PPAU moreover established that suspending SB 174's enforcement would redress those injuries. Because PPAU has shown individualized injury that can be remedied by enjoining SB 174, it satisfies the traditional test for standing.

¶55 The State's real beef with PPAU is that PPAU wants to argue that SB 174 violates its patients' rights. And the State argues that our caselaw does not permit PPAU to do that.

¶56 The State has something of a point, at least in as far as its argument can be read to say that if PPAU wants to advance arguments that might be more directly tied to its patients, it faces additional hurdles. Typically, "a party who satisfies the traditional test has standing and the court need not inquire further." *Sierra Club*, 2006 UT 74, ¶ 41. But when a plaintiff asserts the rights of parties that are not before the court, it must also meet the separate requirements of third-party standing. *Shelledy*, 836 P.2d at 789; *see also Warth*, 422 U.S. at 499.

¶57 The State argues that PPAU lacks standing to assert its patients' claims because it fails to meet the third-party standing requirements we discussed in *Shelledy*. The State contends that third-party standing would only be appropriate if "it is *impossible* for the third-party right holders to assert their own claims." (Citing *Shelledy*, 836 P.2d at 789.) And in the State's view, "women affected by SB 174 have 'never been precluded from asserting' their own . . . rights." (Quoting *id.*)

¶58 Federal courts recognize a general rule that "[o]rdinarily, one may not claim standing . . . to vindicate the constitutional rights of some third party." *Barrows v. Jackson*, 346 U.S. 249, 255 (1953). But "[l]ike any general rule, . . . this one should not be applied where its underlying justifications are absent." *Singleton v.*

*Wulff*, 428 U.S. 106, 114 (1976) (plurality opinion).[8] To establish whether these justifications are present and "determine whether the rule should apply in a particular case," federal courts consider "two factual elements." *Id*. First, "the relationship of the litigant to the person whose right he seeks to assert." *Id.* Second, "the ability of the third party to assert [their] own right." *Id.* at 115–16. [9]

¶59   In *Shelledy*, we looked to the federal standard to develop our third-party standing doctrine. We restated the general rule disfavoring third-party standing. *Shelledy*, 836 P.2d at 789 (citing *Warth*, 422 U.S. at 499). We then noted an exception to that rule if "certain factors are met": (1) "the presence of some substantial relationship between the claimant and the third parties;" (2) "the impossibility of the rightholders asserting their own constitutional rights;" and (3) "the need to avoid a dilution of third parties' constitutional rights." *Id.* (quoting Note, *Standing to Assert*

---

[8] The United States Supreme Court has explained that there are two justifications for this prudential limitation on third-party standing: (1) "courts should not adjudicate such rights unnecessarily, and it may be that in fact the holders of those rights either do not wish to assert them, or will be able to enjoy them regardless of whether the in-court litigant is successful or not"; and (2) "third parties themselves usually will be the best proponents of their own rights." *Singleton*, 428 U.S. at 113–14.

Though this section of *Singleton* represents a plurality, the dissenting justices agreed that any deviation from the general rule "must rest on specific factors outweighing the policies behind the rule itself." *Id.* at 124 (Powell, J., concurring in part and dissenting in part). They also agreed with the plurality about the first justification and only questioned whether the second justification should receive "no more emphasis in this context." *Id.* at 124 n.3.

[9] The two-part test *Singleton* describes was originally supported by only a plurality of the justices. *See id.* at 113–16; *id.* at 121–22 (Stevens, J., concurring in part); *id.* at 125 (Powell, J., concurring in part and dissenting in part). It has since been adopted by a majority and reiterated on several occasions. *See, e.g., Powers v. Ohio*, 499 U.S. 400, 410–11 (1991) (citing *Singleton*, 428 U.S. at 113–16; *Kowalski v. Tesmer*, 543 U.S. 125, 129–30 (2004) (citing *Powers*, 499 U.S. at 411).

*Constitutional Jus Tertii*, 88 HARV. L. REV. 423, 425 (1974)).[10] We took this language from a student note published in the Harvard Law Review that listed "a variety of factors . . . none of which is of controlling significance" that "seem to recur" in third-party standing claims at the United States Supreme Court. *Standing to Assert Constitutional Jus Tertii*, *supra*, at 425.[11]

¶60 This case is our first opportunity to apply this part of *Shelledy.* As an initial matter, it is unclear whether, when *Shelledy* talked about "certain factors" being met, we created a three-factor test. It may be that we were simply following the lead of the law review article we cited, which described them as factors that "seem to recur" in cases where federal courts recognize third-party standing. *Shelledy* itself summarily analyzed whether the plaintiff could show any of the three factors, an unnecessary exercise if the *Shelledy* plaintiff needed to demonstrate all three to prevail. Because PPAU can meet all three, we will act as if that is what *Shelledy* requires. But we emphasize that this should not preclude some future party from arguing that *Shelledy* describes general considerations and not a hard and fast test.

¶61 Under the first prong, the party seeking to assert third-party rights must show "the presence of some substantial relationship between the claimant and the third parties." *Shelledy*, 836 P.2d at 789 (cleaned up). This requirement ensures that the litigant "is fully, or very nearly, as effective a proponent of the right as the [third party]." *See Singleton*, 428 U.S. at 115.

¶62 The United States Supreme Court has explained that a professional relationship can meet this test. *See Griswold v.*

---

[10] Though the district court did not analyze whether PPAU had third-party standing under *Shelledy*, the State raises *Shelledy* to attack the district court's decision. We may affirm on any legal ground apparent on the record. *Bailey v. Bayles*, 2002 UT 58, ¶ 10, 52 P.3d 1158.

[11] We also cited generally to a Columbia Law Review article and a section of a constitutional law textbook discussing federal third-party standing. *See Shelledy*, 836 P.2d at 789 (first citing Henry P. Monaghan, *Third Party Standing*, 84 COLUM. L. REV. 277 (1984); and then citing LAURENCE H. TRIBE, AMERICAN CONSTITUTIONAL LAW § 3-19 (2d ed. 1988)).

*Connecticut*, 381 U.S. 479, 481 (1965). In *Griswold*, the plaintiffs, the Executive Director of the Planned Parenthood League of Connecticut, and a physician who served as the League's medical director, sought to invalidate a Connecticut law prohibiting the use of contraceptives. *Id.* at 480–81. They argued that the law violated their patients' constitutional rights. *Id.* The Court determined that they had standing to assert the rights of their patients in part because of the professional and confidential nature of their relationship. *Id.* at 481.

¶63   In *Singleton*, the Court held that "[t]he closeness of the relationship is patent" between a physician and a woman seeking an abortion. 428 U.S. at 117. In that case, two physicians challenged a Missouri statute that prohibited the use of Medicaid benefits to obtain an abortion unless the abortion was "medically indicated." *Id.* at 108–09. In their complaint, plaintiffs raised claims based on their own rights, but they also asserted the rights of their patients. *Id.* at 110. The Court explained that a "woman cannot safely secure an abortion without the aid of a physician" and that the abortion decision "is one in which the physician is intimately involved." *Id.* at 117. Because of this close relationship, the Court concluded that aside "from the woman herself . . . the physician is uniquely qualified to litigate the constitutionality of the State's interference with" an abortion decision. *Id.*

¶64   A sufficiently close relationship may also exist where the plaintiff serves as an advocate for the third party's rights. *See Eisenstadt v. Baird*, 405 U.S. 438, 445–46 (1972). In *Eisenstadt*, Baird was convicted under a Massachusetts law that criminalized providing contraceptives in certain circumstances. *Id.* at 440–41. Baird challenged his conviction, arguing that the Massachusetts prohibition on contraception "violate[d] the rights of single persons under the Equal Protection Clause of the Fourteenth Amendment." *Id.* at 443. The Court held that Baird had standing to bring these claims even in "the absence of a professional . . . relationship." *Id.* at 445–46. It explained that third-party standing was appropriate because "the relationship between Baird and those whose rights he seeks to assert is . . . that between an advocate of the rights of persons to obtain contraceptives and those desirous of doing so." *Id.* at 445.

¶65   PPAU has a relationship with its patients that resembles the relationships in *Griswold* and *Eisenstadt*. *See Griswold*, 381 U.S.

at 481; *Eisenstadt*, 405 U.S. at 445. As Dr. Turok explained in his declaration: "PPAU's mission is to empower Utahns of all ages to make informed choices about their sexual health and to ensure access for Utahns to affordable, quality sexual and reproductive health care and education."

¶66   The *amicus* brief supporting PPAU's position in the district court explained that "the core of this relationship is the ability to counsel frankly and confidentially about important issues." (Citing AM. MED. ASS'N, *Opinion 1.1.1 – Patient-Physician Relationships, in* CODE OF MEDICAL ETHICS (2016) ("The relationship between a patient and a physician is based on trust.").) In addition, physicians have an "ethical responsibility to place patients' welfare above the physician's own self-interest or obligations to others." (Citing *id.*)

¶67 Because of the relationship between PPAU and its patients, PPAU finds itself well-positioned to litigate the constitutionality of restrictions on its patients' access to the services PPAU provides. In other words, the interests of PPAU and its patients are so intertwined that "there seems little loss in terms of effective advocacy" from allowing PPAU to assert the rights of its patients. *See Craig*, 429 U.S. at 194 (cleaned up).

¶68   Under the second prong, we consider "the impossibility of the rightholders asserting their own constitutional rights." *Shelledy*, 836 P.2d at 789 (cleaned up). Our analysis of this prong in *Shelledy* was limited to a statement that "the [third party] ha[d] never been precluded from asserting its [rights]." *Id.*

¶69   The State argues that PPAU cannot establish this second prong because "women affected by SB 174 have 'never been precluded from asserting' their own . . . rights." (Quoting *id.*) In essence, the State asserts—as does the dissent—that the "impossibility" requirement means that a plaintiff must show that third-party rightsholders had attempted and failed to, or would otherwise be prohibited from, asserting their rights.

¶70   PPAU responds that "[impossibility] is less stringent than the language implies, permitting third-party standing where practical barriers discourage suit by the rights-holder, even if suit is not technically impossible." PPAU points to the note *Shelledy* cited, claiming that it "discusses [the impossibility] prong in the context of claims that may be difficult to bring." (Citing *Standing to Assert Constitutional Jus Tertii, supra* ¶ 59, at 425.) We agree with

PPAU that the "impossibility" requirement in *Shelledy* does not require a plaintiff to show that a third party is absolutely prohibited from asserting its rights.[12]

¶71 The note *Shelledy* quoted cites three United States Supreme Court cases to establish "impossibility" as a consideration for third-party standing, but none of the cases use the phrase

---

[12] The dissent claims that we are engaged in a strained interpretation of *Shelledy*. In the dissent's view, we should apply a dictionary definition of "impossibility" and call our job complete. That might be an appropriate approach if we were interpreting a statute where separation of powers concerns counsel adherence to the words the Legislature voted into law. It might also be appropriate in a contract case, where our respect for parties' ability to enter contracts would preach not looking behind the words the parties chose, absent an ambiguity in the contract's language. But when we apply our own caselaw, *stare decisis* motivates our interpretive enterprise. We want to understand what we said before to promote predictability and stability in the law. And that is what we are doing here.

The dissent also claims that we are overruling *Shelledy*. That is simply not so. *Shelledy*'s holding remains intact, and to the extent it proffered a three-part test, we apply it. If it is our attempt to understand how *Shelledy* should be interpreted that troubles the dissent, we emphasize that refining tests when we apply them is not a novel exercise. We have done this on numerous occasions without anyone suggesting that we were trampling on *stare decisis* principles. *See, e.g.*, *Feasel v. Tracker Marine LLC*, 2021 UT 47, ¶¶ 19–20, 28, 496 P.3d 95 (modifying the duty to warn standard we adopted in *House v. Armour of America, Inc.*, 929 P.2d 340 (Utah 1996)); *Wash. Cnty Sch. Dist. v. Lab. Comm'n*, 2015 UT 78, ¶ 3, 358 P.3d 1091 (clarifying the "direct and natural results test" we adopted in *Mountain States Casing Servs. v. McKean*, 706 P.2d 601, 602 (Utah 1985)). We also note that in this case, the parties briefed the question of how we should interpret *Shelledy*; no party suggested that interpreting the word impossibility would require us to overturn the case.

"impossibility."[13] *Standing to Assert Constitutional Jus Tertii*, *supra* ¶ 59, at 425 n.16 (first citing *Eisenstadt*, 405 U.S. at 446; then citing *NAACP v. Alabama ex rel. Patterson*, 357 U.S. 449, 459 (1958); and then citing *Bantam Books, Inc. v. Sullivan*, 372 U.S. 58, 64 n.6, 65–66 (1963) (dictum)). Upon closer inspection, it appears that the note engaged in a bit of hyperbole when it described one of the considerations as "impossibility."

¶72 The United States Supreme Court has explicitly rejected the assertion that third-party standing requires a showing that the third party is prohibited from asserting its rights. *See Singleton*, 428 U.S. at 117 (explaining that the "obstacles" need not be insurmountable, and the possibility to proceed anonymously or assemble a class to litigate does not prevent there from being a sufficient hindrance to a party's assertion of their rights). In fact, the *Singleton* plurality relied on many of the same cases as the

---

[13] It appears that it is our decision to not read "impossibility" to mean literal impossibility that most troubles the dissent. *See infra* ¶¶ 235–52.

When *Shelledy* analyzed the facts of that case, it did not use the language of literal impossibility. It instead concluded that the third party had not been "precluded" from asserting its rights. *Shelledy*, 836 P.2d at 789. As described above, the federal cases from which we borrowed the doctrine, including those the note *Shelledy* relies on describes, do not speak in terms of literal impossibility. And, perhaps most tellingly, our test for public interest standing does not require that a plaintiff show that it is impossible for someone else to bring the claim. We instead require that a would-be public interest plaintiff show that "the issue is *unlikely* to be raised at all if the plaintiff is denied standing." *Jenkins*, 675 P.2d at 1150 (emphasis added).

If we were to read impossibility as strictly as the dissent advocates, it would be easier for a party without traditional standing to bring suit on behalf of the public at large than it would be for a party with traditional standing to assert the claims of a third party with whom it shares a close relationship.

Simply stated, our reading of *Shelledy* better comports with what *Shelledy* did, better aligns with the federal courts' articulation of the test, and better harmonizes with our public-interest standing jurisprudence.

Harvard note for its conclusion that third-party standing only requires that a third party face "some genuine obstacle" to assert their rights. *Id.* at 116–17 (first citing *Patterson*, 357 U.S. at 459; then citing *Eisenstadt*, 405 U.S. at 446; and then citing *Barrows*, 346 U.S. at 259). The plurality also explicitly rejected the argument that the Court's "prior cases allow assertion of third party rights only when such assertion by the third parties themselves would be in all practicable terms impossible." *Id.* at 116 n.6 (cleaned up). It pointed out that the Court has found standing when a plaintiff asserts a third party's right to be protected from compelled disclosure even though the third party "could have obtained [relief], suing anonymously by the use of pseudonyms." *Id.*; *see also Patterson*, 357 U.S. at 458–59.

¶73 In *Singleton*, the Court discussed several obstacles that may sufficiently hinder a woman's assertion of her own rights. The Court first explained that "she may be chilled . . . by a desire to protect the very privacy of her decision from the publicity of a court suit." 428 U.S. at 117. It next considered "the imminent mootness . . . of any individual woman's claim," explaining that after a few months, "her right . . . will have been irrevocably lost." *Id.* The Court noted "that these obstacles are not insurmountable" because a woman could sue under a pseudonym or assemble a class to bring the suit. *Id.* The Court nevertheless held that there was a sufficient obstacle to justify third-party standing. *Id.* The Court concluded its decision by explaining that "there seems little loss in terms of effective advocacy from allowing . . . a physician" to assert its patients' rights. *Id.*

¶74 PPAU provided the district court with declarations from three different patients, each of whom described the obstacles they face that hinder their ability to sue to protect their own rights. Jane Doe explained that she does not have the capacity or financial ability to bring a lawsuit, that she would want to preserve her anonymity, and that she feared "repercussions and judgments" if she were called to testify.[14] Alex Roe asserted that she "would be very scared to be in court" and did not have the money or time to litigate. Roe also expressed a concern about preserving her

---

[14] Because the district court allowed for these declarations to be submitted under pseudonyms for anonymity, we refer to the declarants similarly.

anonymity. And Ann Moe claimed that challenging the law herself "would be pretty overwhelming" because of her full-time job and family obligations. Moe also pointed to the potential publicity and cost of litigation as barriers to bringing suit in her own name.

¶75 The State presented no contrary evidence to the district court. It instead asserted that some hypothetical Utahn could bring a claim instead of PPAU. And, on appeal, the State points to "the examples of women asserting abortion rights in court" as evidence that individual women should be the ones challenging SB 174. The State posits that standing is improper because women in Utah "could bring a constitutional challenge in their own name, form an association to do so, or join PPAU's suit." But the consideration is not whether the third party could possibly bring a challenge, but whether there is "some genuine obstacle" to the third party asserting its rights. *Id.* at 116.

¶76 The unchallenged declarations from PPAU's patients establish that PPAU's patients are sufficiently prevented from asserting their own rights because of the costs, desires to preserve anonymity, and concerns about appearing in court to present a polarizing challenge.

¶77 Under *Shelledy's* third prong, a party must show "the need to avoid a dilution of third parties' constitutional rights that would result" if third-party standing were not permitted. 836 P.2d at 789 (cleaned up). As the Harvard note explained, "[t]he risk of dilution of the constitutional rights of third parties is . . . a general problem recurring in all cases involving claims of [third-party standing]." *Standing to Assert Constitutional Jus Tertii*, *supra* ¶ 59, at 425 n.17. And this risk becomes more apparent in particular circumstances.

¶78 For example, in *Craig v. Boren*, 429 U.S. 190 (1976), the United States Supreme Court considered a challenge to an Oklahoma law "prohibit[ing] the sale of nonintoxicating 3.2% beer to males under the age of 21 and to females under the age of 18." *Id.* at 192 (cleaned up). Appellant, a vendor of 3.2% beer, argued that the law denied 18- to 20-year-old males equal protection of the law in violation of the Fourteenth Amendment. *Id.*

¶79 The Court determined that the vendor had standing to assert the rights of men under the age of 21. *Id.* at 195. The Court held that a vendor with traditional standing to challenge an act is entitled to assert the rights of third parties that "would be 'diluted

or adversely affected' should her constitutional challenge fail." *Id.* (quoting *Griswold*, 381 U.S. at 481). It also explained that if the vendor lacked the ability to assert these rights, "the threatened imposition of governmental sanctions might deter [the vendor] from selling 3.2% beer to young males, thereby ensuring that enforcement of the challenged restriction against the vendor would result indirectly in the violation of third parties' rights." *Id.* (cleaned up).

¶80 As in *Craig*, SB 174 aims the penalties at the person performing the abortion, not the person seeking the abortion. *See* UTAH CODE § 76-7a-201. In essence, the enforcement of SB 174 against PPAU prevents abortions from being obtained, indirectly violating the asserted rights of PPAU's patients. This is sufficient to establish that the rights of PPAU's patients would be diluted if third-party standing were not permitted.

¶81 PPAU satisfies the requirements to assert the constitutional rights of its patients. The district court did not err when it concluded that PPAU has standing to assert the claims it pleaded.

## II. THE DISTRICT COURT DID NOT ABUSE ITS DISCRETION WHEN IT DETERMINED THAT PPAU SATISFIED RULE 65A'S REQUIREMENTS FOR A PRELIMINARY INJUNCTION

¶82 Under the standard in place when PPAU moved for a preliminary injunction, it needed to demonstrate that (1) "[t]here is a substantial likelihood that [it] will prevail on the merits of the underlying claim, or the case presents serious issues on the merits which should be the subject of further litigation"; (2) it "will suffer irreparable harm unless the order or injunction issues"; (3) "[t]he threatened injury to [it] outweighs whatever damage the proposed order or injunction may cause to the party restrained or enjoined"; and (4) "[t]he order or injunction, if issued, would not be adverse to the public interest." UTAH R. CIV. P. 65A(e) (2014).

¶83 The State argues that the district court abused its discretion, because, in the State's view, PPAU failed to establish any of the four elements for a preliminary injunction.

*A. The District Court Correctly Determined that PPAU Presented
Serious Issues on the Merits that Should Be the Subject of
Further Litigation*

¶84  The district court concluded that PPAU presented "at least serious issues on the merits that should be the subject of further litigation." It held that PPAU had demonstrated serious issues on the merits of six of its constitutional claims: (1) a right to bodily integrity, (2) a right to determine one's own family composition, (3) a right to equal protection, (4) a right to uniform operation of laws, (5) a right of conscience, and (6) a right to privacy.[15]

¶85  Before we begin our analysis of the State's arguments, it is important to understand what rule 65A required of an applicant who sought to show that her case presents a serious issue on the merits which should be the subject of further litigation. Utah law does not define what a serious issue on the merits is in the context of a preliminary injunction. We adopted the serious issues standard in 1991.[16] Since then, we have generated little caselaw discussing

_____

[15] Although the district court concluded that PPAU had raised serious issues with respect to six of its claims, it would have been sufficient for it to have found serious issues with respect to a single claim to support the grant of the injunction. For this reason, this opinion will not review the district court's decision on all six claims. We offer no opinion, favorable or unfavorable, on any district court conclusion that we do not address, and our decision to not discuss any given claim should not be read to convey any significance.

[16] The pre-1991 version of rule 65A gave district courts broad discretion to grant injunctions. Any of the following could be grounds for an injunction:

> (1) when it appears by the pleadings on file that a party is entitled to the relief demanded, and such relief, or any part thereof, consists in restraining the commission or continuance of some act complained of, either for a limited period or perpetually;
> (2) when it appears from the pleadings or by affidavit that the commission or continuance of some act during the litigation would produce great or

(continued . . .)

what it means to show serious questions going to the merits. Indeed, most, if not all, of our published decisions analyzed whether there was a substantial likelihood that the applicant would prevail on the merits of the underlying claim. *See, e.g.*, *Water & Energy Sys. Tech., Inc. v. Keil*, 1999 UT 16, ¶ 8, 974 P.2d 821, *Aquagen Int'l, Inc. v. Calrae Tr.*, 972 P.2d 411, 413 (Utah 1998).

¶86   The State wrestles with this lack of caselaw and argues that although the serious issues standard likely requires less than the "substantial likelihood of success on the merits" standard, it requires more than reasonable opposing arguments about the constitutionality of a law. Since we borrowed the preliminary injunction standards from the Tenth Circuit, we look to Tenth Circuit caselaw for guidance.[17]

---

irreparable injury to the party seeking injunctive relief;

(3) when it appears during the litigation that either party is doing or threatens, or is about to do, or is procuring or suffering to be done, some act in violation of the rights of another party respecting the subject matter of the action, and tending to render the judgment ineffectual;

(4) in all other cases where an injunction would be proper in equity.

UTAH R. CIV. P. 65A(e) (1990).

[17] The advisory committee note to paragraph (e) of rule 65A states: "The standards set forth in paragraph (e) are derived from *Tri–State Generation & Transmission Ass'n. v. Shoshone River Power Inc.*, 805 F.2d 351, 355 (10th Cir. 1986), and *Otero Savings & Loan Ass'n. v. Fed. Rsrv. Bank of Kan. City*, 665 F.2d 275, 278 (10th Cir. 1981)." The State notes that the Tenth Circuit no longer incorporates the serious issues element for its preliminary injunction test because of *Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7 (2008). In *Winter*, the Court overruled the Ninth Circuit's application of a modified preliminary injunction test under which plaintiffs who demonstrated a strong likelihood of prevailing on the merits could receive a preliminary injunction based only on a possibility, rather than a likelihood, of irreparable harm. *Id.* at 22. Because the Tenth Circuit interpreted *Winter* as

(continued . . .)

¶87 According to the Tenth Circuit, serious merits issues are those that are so "substantial, difficult and doubtful, as to make them a fair ground for litigation and thus for more deliberate investigation." *Otero Sav. & Loan Ass'n v. Fed. Rsrv. Bank of Kan. City*, 665 F.2d 275, 278 (10th Cir. 1981) (cleaned up). In other words, serious merits issues are based on arguments that are "clearly not frivolous" and "make the resolution of the final question of law a genuinely debatable issue." *Tri-State Generation & Transmission Ass'n v. Shoshone River Power, Inc.*, 805 F.2d 351, 359 (10th Cir. 1986).

¶88 In all, the State is correct that the serious issues standard requires less than the "substantial likelihood of success" standard. Using the Tenth Circuit's definitions, a preliminary injunction applicant that raises questions "going to the merits that are serious, substantial, difficult and doubtful" establishes "fair grounds for [further] litigation," which makes the "resolution of the final question of law a genuinely debatable issue." *Id.* at 359.

¶89 The State claims that, even under the now-extinct, more lenient serious issues standard, the district court erred in four ways when it concluded that PPAU had raised serious issues on the merits of its claims.[18] The State first argues that PPAU cannot

---

invalidating any preliminary injunction standard that deviated from the standard *Winter* restated, it repudiated the *Tri-State Generation* test and its serious issues prong. *Diné Citizens Against Ruining Our Env't v. Jewell*, 839 F.3d 1276, 1282 (10th Cir. 2016). However, the Tenth Circuit borrowed the serious issue element from the Second Circuit, which continues to employ it despite *Winter*. *See Cont'l Oil Co. v. Frontier Ref. Co.*, 338 F.2d 780, 782 (10th Cir. 1964) (citing *Hamilton Watch Co. v. Benrus Watch Co.*, 2 Cir., 206 F.2d 738, 740); *see also Citigroup Glob. Mkts., Inc. v. VCG Special Opportunities Master Fund Ltd.*, 598 F.3d 30, 38 (2d Cir. 2010) ("We have found no command from the Supreme Court that would foreclose the application of our established 'serious questions' standard as a means of assessing a movant's likelihood of success on the merits."). For all future cases in Utah, the dispute is now academic because the Legislature amended rule 65A to eliminate the serious issues portion of the rule.

[18] In addition to these arguments, the State levies criticisms about some of the district court's conclusions concerning certain

(continued . . .)

prevail because the Utah Constitution does not expressly mention a right to an abortion. The State next asserts that even if we have recognized an unenumerated right that could reasonably be understood to encompass a right to choose to have an abortion, our constitution only enshrines specific unenumerated rights, not broad ones. Third, the State claims that the district court erred because a review of Utah history demonstrates that Utah law criminalized abortion both before and after statehood and that this history conclusively establishes that the people of Utah did not intend to enshrine a standalone, implicit right to an abortion in their constitution. The State buttresses that argument with the United States Supreme Court's discussion of the history of abortion in *Dobbs v. Jackson Whole Women's Health Organization*, 597 U.S. 215 (2022). Finally, the State contends that *Dobbs*'s holding—that the due process clause of the Fourteenth Amendment fails to confer a right to choose to have an abortion—means that Utah's due process clause cannot provide such a right.[19]

### 1. The Utah Constitution Recognizes and Protects Unenumerated Rights

¶90 The State first contends that the district court's serious issues conclusion was erroneous because the Utah Constitution makes no mention of a right to an abortion. Although the State is correct that the constitution does not use the word abortion, that is not dispositive for multiple reasons. As we discuss more fully below, PPAU alleged that SB 174 "is unconstitutional because it forecloses abortion as the means by which individuals exercise substantive rights" that the Utah Constitution protects. That is, while the Utah Constitution does not explicitly enshrine a right to an abortion, PPAU alleges that restricting the ability to choose to have an abortion violates rights that the Utah Constitution does explicitly protect—such as the right to equal protection under the

---

rights under the Utah Constitution. We address these specific arguments after we discuss the State's larger, more general attacks on the district court's decision.

[19] It bears noting that the State does not argue that the district court erred by not analyzing whether, even if PPAU can demonstrate that SB 174 violates a right the Utah Constitution protects, SB 174 survives under the appropriate level of scrutiny. We offer no opinion on that question.

law. PPAU also alleges that SB 174 violates certain unenumerated rights, including the right to bodily autonomy and the right to make certain decisions related to one's family.

¶91 The Utah Constitution makes plain that not all rights it protects are enumerated. *See, e.g.*, UTAH CONST. art. I, § 25. Article I, section 25 expressly protects unenumerated rights, stating that "[t]his enumeration of rights shall not be construed to impair or deny others retained by the people." We have characterized these retained rights as those that are "natural, intrinsic, or prior in the sense that our Constitutions presuppose them." *In re J.P.*, 648 P.2d 1364, 1373 (Utah 1982) (cleaned up).[20]

¶92 We have also, at times, identified substantive rights that our state constitution's due process clause protects. Article I, section 7 states, "No person shall be deprived of life, liberty, or property, without due process of law." Despite no express reference to these rights in the constitutional text, we have recognized substantive due process rights where state action has foreclosed a right "so fundamental or important that it is protected from extinguishment." *In re Adoption of J.S.*, 2014 UT 51, ¶ 22, 358 P.3d 1009.

¶93 We have read these constitutional provisions not as hollow promises but as essential guarantees of important liberties. On several occasions, this court has recognized, analyzed, and enforced rights that the Utah Constitution does not explicitly list. In *Jensen ex rel. Jensen v. Cunningham*, for example, we stated that "parents have a fundamental right to make decisions concerning the care and control of their children." 2011 UT 17, ¶ 73, 250 P.3d 465. We further explained that "this general right necessarily encompasses the more specific right to make decisions regarding the child's medical care." *Id.* Stated differently, even though the

---

[20] Constitutional protection for unenumerated natural rights is not unique to Utah. By 1868, "approximately 67% of all Americans then living resided in states that constitutionally protected unenumerated individual liberty rights." Steven G. Calabresi & Sofía M. Vickery, *On Liberty and the Fourteenth Amendment: The Original Understanding of the Lockean Natural Rights Guarantees*, 93 TEX. L. REV. 1299, 1303 (2015). Indeed, twenty-four of the thirty-seven then-existing states had such provisions in their constitutions. *Id.*

Utah Constitution makes no mention of a parent's right to make decisions concerning the care of a child nor a parent's right to make medical decisions concerning their child, we understood that these were rights that the Utah Constitution nonetheless recognizes and protects.

¶94 Similarly, in *State v. Murphy*, we stated that there is a "fundamental right to be left alone, a right to be allowed to succeed or fail, a right to ignore gratuitous advice, a right not to tell every problem to the social worker, and a right not to answer the door," and that "[t]hese components of the right to privacy belong to, and are valued by, all people . . . ." 760 P.2d 280, 285 (Utah 1988) (cleaned up).[21]

¶95 That the Utah Constitution protects certain unenumerated rights makes quick work of the State's first argument. It isn't

---

[21] The *Murphy* court did not assess whether the people of Utah at the time of framing would have understood these to be among the unenumerated rights that the Utah Constitution protects. Without opining on any of the specific rights *Murphy* identifies, we note that if we were to return to the sources we have mined to confirm the existence of unenumerated rights, we might uncover support for some of *Murphy*'s assertions.

For example, John Locke wrote about personal liberty as, "so far as a man has power to think, or not to think, to move or not to move, according to the preference or direction of his own mind; so far a man is free." John Locke, *An Essay Concerning Human Understanding*, bk. II, ch. 21, § 8 (Peter H. Nidditch ed., Oxford Univ. Press 1975) (1690). And, by the time of Utah's statehood, the United States Supreme Court had opined "no right is held more sacred, or is more carefully guarded by the common law, than the right of every individual to the possession and control of his own person, free from all restraint or interference of others, unless by clear and unquestionable authority of law." *Union Pac. Ry. Co. v. Botsford*, 141 U.S. 250, 251 (1891). The *Botsford* court quoted Michigan Supreme Court Justice and legal scholar Thomas Cooley to assert that the "right to one's person may be said to be a right of complete immunity; to be let alone." *Id.* (cleaned up). As we discuss below, these are the types of sources to which we have looked to detect one of the unenumerated rights that article I, section 25 acknowledges. *See infra* Part II.A.2.

enough to say that because the Utah Constitution does not use the word abortion, it cannot contain a right that could be infringed by a restriction on the ability to seek an abortion. PPAU is entitled to try and demonstrate to the district court that SB 174 infringed an enumerated or an unenumerated right the Utah Constitution protects.

¶96 The State also offers a variant of this argument and contends that "nothing in the [constitutional convention] debates on provisions PPAU relies on suggests they protected an implied right to abortion."[22] Although convention debates can provide persuasive evidence about what the constitutional language meant in 1895, the State has cited nothing for the proposition that article I, section 25 only protects unenumerated rights that found their way into a convention debate. And we are unaware of any case where this court has taken that position. To the contrary, "our focus is on the objective original public meaning of the text, not the intent of those who wrote it." *South Salt Lake City v. Maese*, 2019 UT 58, ¶ 19 n.6, 450 P.3d 1092. "Evidence of [the] framers' intent can inform our understanding of the text's meaning, but it is only a means to this end, not an end in itself." *Id.* The absence of convention discussion does not doom a claim that the Utah Constitution protects an unenumerated right.

¶97 In fairness to the State, while we have recognized rights that the Utah Constitution does not enumerate, we have not always detailed the analytical process we employed before we were confident that we had properly identified an unenumerated right.[23]

¶98 *In re J.P.* is illustrative on this point. *See* 648 P.2d at 1373, 1375. That case is perhaps the most complete explanation we have given of how we know an unenumerated right exists. In *In re J.P.*,

---

[22] For the purpose of addressing the State's argument, we accept its framing. But we emphasize that the relevant constitutional inquiry is whether the Utah Constitution protects a right that might be infringed by a law unduly restricting abortion access, not whether the Utah Constitution contains an "implied right to abortion."

[23] We have also been less than clear about when a right is an unenumerated right that article I, section 25 references and when it is a due process right recognized under article I, section 7.

the State sought to terminate a mother's parental rights under a statute that allowed the State to do so when it was in the child's best interest. *Id.* at 1366. The mother challenged the constitutionality of the statute's best interest standard under the federal and Utah constitutions. *Id.* The district court dismissed the State's termination petition because it concluded that the statute violated the mother's "substantive right to liberty, privacy, and family integrity as guaranteed by the Ninth and Fourteenth Amendments to the United States Constitution" and the due process guaranteed by the federal and Utah constitutions.[24] *Id.* (cleaned up).

¶99 The State appealed. We affirmed the district court, concluding that "the Utah Constitution recognizes and protects the inherent and retained right of a parent to maintain parental ties to his or her child" under article I, sections 7 and 25. *Id.* at 1377. That is, notwithstanding that the Utah Constitution does not mention the right of a parent to maintain the parent-child relationship, we held that right to be both one of the unenumerated rights article I, section 25 refers to and one of the fundamental rights the state constitution's due process clause protects.

¶100 We began our analysis by noting that the Utah Constitution instructs that "Frequent recurrence to fundamental principles is essential to the security of individual rights and the perpetuity of free government." *In re J.P.*, 648 P.2d at 1372 (quoting UTAH CONST. art. I, § 27). We explained that a "residuum of liberty reposes in the people" and "[t]hat liberty is not limited to the exercise of rights specifically enumerated in either the United States or the Utah Constitutions." *Id.* We buttressed this conclusion with a reference to article I, section 25's declaration that the state constitution's "enumeration of rights shall not be construed to impair or deny others retained by the people." *Id.*

¶101 Important to the argument the State raises here, *In re J.P.* did not reference any discussion from the Utah Constitutional

---

[24] The Ninth Amendment states, "The enumeration in the Constitution, of certain rights, shall not be construed to deny or disparage others retained by the people." Article I, section 25 of the Utah Constitution uses similar language, providing "This enumeration of rights shall not be construed to impair or deny others retained by the people."

Convention to identify or define the rights it recognized. Rather, we cited a few Utah cases, United States Supreme Court cases, and sister state jurisprudence. *See id.* at 1372–74. The cases either recognized the fundamental rights of parents that are protected by due process, or the natural rights that parents enjoy. For example, we cited *In re Walter B.* for the proposition that "[a] parent has a fundamental right, protected by the Constitution, to sustain his relationship with his child."[25] *Id.* (plurality opinion) (cleaned up) (quoting 577 P.2d 119, 124 (Utah 1978)).

¶102 We next looked to the United States Supreme Court's declaration in *Meyer v. Nebraska* that the "right of the individual . . . to marry, establish a home and bring up children . . . [was] long recognized at common law as essential to the orderly pursuit of happiness by free men," and thus, was one of the liberties so fundamental it must be respected by due process. *Id.* (quoting 262 U.S. 390, 399 (1923)). In addition, we pointed to *Quilloin v. Walcott*, in which the Court stated that it had "recognized on numerous occasions that the relationship between parent and child is constitutionally protected."[26] *Id.* (quoting 434 U.S. 246, 255 (1978)).

¶103 We concluded that the "rights inherent in family relationships—husband-wife, parent-child, and sibling—are the most obvious examples of rights retained by the people. They are natural, intrinsic, or prior in the sense that our Constitutions presuppose them, as they presuppose the right to own and dispose of property." *Id.* at 1373 (cleaned up).[27]

¶104 Among the cases we cited for support was *Loving v. Virginia*, 388 U.S. 1 (1967). We relied on *Loving* for the proposition

---

[25] The *In re Walter B.* court cited no authority and provided no analysis to explain how it reached this conclusion.

[26] In *Quilloin*, the Court followed this statement with citations to *Wisconsin v. Yoder*, 406 U.S. 205, 231–33 (1972), *Stanley v. Illinois*, 405 U.S. 645 (1972), and *Meyer v. Nebraska*, 262 U.S. 390, 399–401 (1923). *See* 434 U.S. at 255.

[27] *In re J.P.*'s statement notwithstanding, our state constitution does more than presuppose the right to own property—it specifically protects it. Article I, section 1 of the Utah Constitution declares "[a]ll persons have the inherent and inalienable right . . . to acquire, possess and protect property."

that the "freedom to marry has long been recognized as one of the vital personal rights essential to the orderly pursuit of happiness by free men." *In re J.P.*, 648 P.2d at 1373 (quoting 388 U.S. at 12).[28] We quoted *Skinner v. Oklahoma ex rel. Williamson* for the proposition that "the right to procreate [is] among the 'basic civil rights of man.'" *Id.* (quoting 316 U.S. 535, 541 (1942)). This authority sufficed for us to conclude that the "integrity of the family and the parents' inherent right and authority to rear their own children have been recognized as fundamental axioms of Anglo-American culture, presupposed by all our social, political, and legal institutions." [29] *Id.*

¶105 We then applied the principle that "parents[] [have an] inherent right and authority to rear their own children," to the termination statute. *Id.* We framed the inquiry using the language of due process. *Id.* at 1375–76. We announced that our decision relied on the fact that the rights the termination statute infringed were fundamental to the "existence of the institution of the family, which is 'deeply rooted in this Nation's history and tradition' . . . and in the 'history and culture of Western civilization.'" *Id.* at 1375 (cleaned up). Although we talked about parental rights in due process terms, we also noted that "the right of a parent not to be deprived of parental rights without a showing of unfitness . . . is so fundamental to our society . . . that it ranks among those rights referred to in Article I, [section] 25 of the Utah Constitution . . . as being retained by the people." *Id.*

---

[28] The *Loving* court elaborated that to deny the fundamental freedom to marry "on so unsupportable a basis as . . . rac[e]" was to directly subvert the "principle of equality at the heart of the Fourteenth Amendment" and "surely to deprive all the State's citizens of liberty without due process of law." 388 U.S. at 12.

[29] *In re J.P.* also quoted the United States Supreme Court's declaration that "the liberty interest in family privacy has its source . . . in intrinsic human rights . . . ." 648 P.2d at 1373 (quoting *Smith v. Org. of Foster Fams. for Equal. & Reform*, 431 U.S. 816, 845 (1977)). We further noted this court has repeatedly characterized a parent's right and obligation to a child as natural or prior. *See id.* at 1373–74 (first citing *Mill v. Brown*, 88 P. 609, 613 (Utah 1907); then citing *In re Jennings*, 432 P.2d 879, 880 (Utah 1967); and then citing *In re Castillo*, 632 P.2d 855, 856 (Utah 1981)).

¶106  We further stated that "[t]his recognition of the *due process* and *retained rights* of parents promotes values essential to the preservation of human freedom and dignity and to the perpetuation of our democratic society." *Id.* at 1375–76 (emphases added). This was consistent with United States Supreme Court jurisprudence, summarizing inherent, natural, and retained parental rights as being protected by "the Due Process Clause of the Fourteenth Amendment, the Equal Protection Clause of the Fourteenth Amendment, and the Ninth Amendment." *Id.* at 1374 (cleaned up). In the end, we anchored *In re J.P.*'s holding—that the Utah Constitution guaranteed parents a right to "maintain parental ties to his or her child"—in both article I, sections 7 *and* 25. *Id.* at 1377.

¶107  As *In re J.P.* demonstrates, even when we take the time to try and show our math, we have not definitively stated what a party needs to demonstrate for us to recognize an unenumerated right that either article I, section 7 or 25 protects. Nor have we always clearly delineated when the constitutional right we identify is a substantive due process right and when it is one of the unenumerated rights article I, section 25 acknowledges (or perhaps, when it is both).

¶108  *In re J.P.* nevertheless provides an example of how a party should approach the task of identifying an unenumerated right. *In re J.P.* relied on, among other things, several United States Supreme Court and sister state cases referencing a right (or similar rights), passages from Blackstone and Kent, and a 1909 treatise.[30] *See generally id.* at 1374–77. *In re J.P.* found that sufficiently persuasive.

---

[30] When digging into these commentaries, one finds Blackstone reporting that at common law, only a father had the power to "correct" his child in a reasonable manner, to consent to marriage if the child was underage, and to assign his parental powers to a guardian or a schoolmaster. 1 WILLIAM BLACKSTONE, COMMENTARIES *452–53. In his commentaries on American law, Kent described parents enjoying similar rights over their children. 2 JAMES KENT, COMMENTARIES *218–25. The 1909 treatise noted that "The right of the father is generally held to be a paramount right, if he is a fit person." WALTER C. TIFFANY, THE LAW OF PERSONS AND DOMESTIC RELATIONS 268–70 (2d ed. 1909).

¶109  It is important to note that we decided *In re J.P.* before we began to emphasize that we would interpret the Utah Constitution by focusing on its original public meaning. This emphasis helps define the inquiry *In re J.P.* exemplifies. We ask parties to look to history and tradition as part of the inquiry into what statehood-era Utahns would have understood the constitution's text to mean. From that original meaning, we can identify the constitutionally protected principle. That is, an inquiry into history and tradition is not an end in itself; it is a means to discover what the constitutional language meant to Utahns when it entered the constitution.

¶110 Simply stated, we have on many occasions recognized and analyzed rights that article I, section 25 references. Were we to accept the contention that the Utah Constitution only protects the rights it enumerates, we would read article I, section 25 out of the constitution and eliminate an important protection the people of Utah saw fit to emphasize in their founding document. This we cannot do. Even if we have not always been clear about where we look to find the unenumerated rights the Utah Constitution protects, and even if we have sometimes been imprecise about what a party must show to convince us that a right exists, we have never deviated from our recognition that the Utah Constitution protects certain rights that the text does not explicitly describe.

2. The Utah Constitution Protects Rights As They Were Understood at the Time They Were Enshrined in the Constitution

¶111  The State next argues that even if PPAU were to identify some unenumerated right that SB 174 might infringe, the constitution only guarantees specific, narrowly defined rights. When the court questioned the State about a right to bodily integrity, for example, the State replied that there is "not the history to support . . . applying that right the way the plaintiff has asked for in this case." Oral Argument at 00:14:20–14:24, *Planned Parenthood Ass'n of Utah v. Utah*, No. 20220696 (Aug. 8, 2023), https://www.youtube.com/watch?v=qBwWPt1ITUk. Essentially, while the State acknowledges the Utah Constitution may protect certain unenumerated rights, like a right to bodily integrity, it also argues that PPAU cannot generalize this right to protect a choice to seek an abortion.

¶112  We rejected a similar argument in *In re Adoption of K.T.B.*, 2020 UT 51, 472 P.3d 843. There, a birth mother unsuccessfully

attempted to intervene in the adoption of her child. *Id.* ¶ 2. The mother challenged Utah's Adoption Act, arguing that it violated her substantive due process rights. *Id.* ¶¶ 1–3. We concluded that because a mother's parental rights are "vested" and "inherent," they are fundamental, and thus, a mere "failure to comply with any state-prescribed procedure" cannot result in the termination of parental rights. *Id.* ¶ 37 (cleaned up).

¶113 We noted that parental rights are "among those rights referred to in Article I, [section] 25 of the Utah Constitution and the Ninth Amendment of the United States Constitution as being *retained* by the people," so only a "showing of unfitness, abandonment, or substantial neglect" can justify termination of parental rights. *Id.* (quoting *In re J.P.*, 648 P.2d 1364, 1375 (Utah 1982)). We concluded that the birth mother's substantive due process rights had been violated. *Id.* ¶ 51.

¶114 We reached that conclusion over a dissent that resembles the argument the State advances here. The *In re K.T.B.* dissent argued that parties needed to make "a *specific showing* that the *precise interest* asserted by the parent is one that is deeply rooted in this Nation's history and tradition and in the history and culture of Western civilization." *Id.* ¶ 131 (Lee, A.C.J, dissenting) (citing *In re J.S.*, 2014 UT 51, ¶ 57, 358 P.3d 1009 (plurality opinion)). The dissent contended that the mother needed to show "more than just a tradition of respecting parental rights generally," but instead "a tradition of protecting parental rights despite a procedural default." *Id.* ¶ 152.

¶115 The court rejected this assertion, in part, because our constitutional inquiry asks whether specific "conduct falls within the umbrella of protected [] rights," not "whether [people] have a recognized right to be free of a particular form of governmental interference" with that right.[31] *Id.* ¶ 63 (emphasis omitted).

---

[31] To be sure, *In re K.T.B.* recognized that "the level of generality at which an asserted right is framed may be an outcome-determinative issue in some cases." 2020 UT 51, ¶ 69. Ultimately *In re K.T.B.* did not need to grapple with the level of generality question because the scope of the constitutional right at issue there had already been defined and defined broadly. *Id.* ¶¶ 70–73.

¶116 The relevant question is not, as the State frames it, whether we define constitutional rights broadly or narrowly. Rather, the proper inquiry focuses on how the people of Utah at the time of statehood would have understood the right that the constitution protects. *See Neese v. Utah Bd. of Pardons & Parole*, 2017 UT 89, ¶¶ 96, 100, 416 P.3d 663. This means that sometimes the right will be stated broadly because that articulation reflects the public understanding when Utah voters approved the constitution.

¶117 For example, *In re J.P.* identified the rights at play broadly. There, we did not ask whether history and tradition recognized that the government must show unfitness before terminating parental rights. We asked whether the Utah Constitution would have presupposed that parents enjoyed a right to raise their children. 648 P.2d at 1373–76. And that led to the conclusion that the parental rights termination statute violated that principle. *Id.* at 1377.

¶118 Similarly, when we held in *Jensen ex rel. Jensen v. Cunningham* that "parents have a fundamental right to make decisions concerning the care and control of their children," we noted how "this general right necessarily encompasses the more specific right to make decisions regarding the child's medical care." 2011 UT 17, ¶ 73, 250 P.3d 465. We did not require the Jensens to show that the constitution guarantees a specific right for a parent to direct his child's medical care—it was enough that they demonstrated a constitutional right to care for their children. *See id.* ¶¶ 72–73. We then applied that principle to the specific question the Jensens brought to court. *See generally id.* ¶¶ 78–94.

¶119 As these cases demonstrate, our job is to define the constitutional principle as it was understood by those who voted our constitution into existence. That understanding will govern the breadth of the principle. PPAU is entitled to attempt to identify the rights that the people of Utah at the time of framing would have understood that the constitution protected and to argue that SB 174 impermissibly infringes upon those rights. The district court correctly proceeded to analyze whether PPAU had presented arguments on those claims that raised the serious issues needed to sustain an injunction.

3. Utah's History of Criminalizing Abortion Has Evidentiary Weight but Does Not Automatically Discredit the District Court's Conclusion that PPAU Raises Serious Issues on the Merits of its Claims

¶120 The State's next argument focuses on Utah's history of criminalizing abortion. The State argues that because abortion had been illegal prior to statehood and was criminalized until *Roe v. Wade*, 410 U.S. 113 (1973), the constitution could not possibly enshrine any right that an abortion restriction would infringe.

¶121 The State begins its historical recitation with laws from the Utah Territory. It notes that the Utah Territory forbade providing, supplying, or administering the means to cause the "miscarriage" of a pregnant woman, except when a miscarriage was necessary to preserve the woman's life. (Quoting UTAH COMPILED LAWS § 21-3-1972 (1876).)

¶122 Turning to the 1898 Utah Code, the State maintains that there is significance to the fact that when the territorial "miscarriage" law was recodified into the first state code, it was housed in a chapter entitled "Abortion." (Citing UTAH REV. STAT. § 75-27-4226 to -4227 (1898).)

¶123 The following decade, the Legislature declared it unprofessional conduct for a doctor to "offer[] or attempt[] to procure or aid or abet in procuring a criminal abortion." (Quoting UTAH COMPILED LAWS § 63-1736(1) to-(2) (1907).) The State argues that it is meaningful that while we upheld criminal convictions of people charged with violating abortion laws and medical license revocations for performing abortions, no adverse party ever challenged the constitutionality of the abortion laws. The State contends that the "lack of any [constitutional] challenges by litigants or rulings by this Court further confirm the general public at the time of the founding did not understand the Utah Constitution to protect an implied right to abortion."

¶124 The State also looks outside Utah for historical evidence to support the proposition that past criminalization of abortion practices mandates a conclusion that SB 174 is constitutional. The State quotes *Dobbs v. Jackson Women's Health Organization* and claims that "[a]t common law, abortion was criminal in at least some stages of pregnancy and was regarded as unlawful and could have very serious consequences at all stages." (Quoting 597 U.S.

215, 241 (2022).) The State relies on *Dobbs*'s observation that by the time the Fourteenth Amendment was ratified, twenty-eight out of thirty-seven states criminalized pre-quickening[32] abortions, as did all thirteen territories that would later become states, including Utah. (Quoting *id.* at 248–50, app. B.) And the State relies on *Dobbs*'s statement that the motivation for abortion bans in the 1800s and 1900s was "a sincere belief that abortion kills a human being." (Quoting *id.* at 254.)

¶125  The State uses this history to argue that Utah's territorial laws, the 1898 Code, and law from other states at the time of statehood demonstrate that the Utahns who ratified the constitution in 1895 understood the constitution to contain no rights that SB 174 infringes upon. Although we understand the State's argument and recognize that it raises relevant considerations, its proffered history does not negate the district court's conclusion that there are serious issues going to the merits.

a. The Utah Constitution Enshrines Principles, Not Application of Those Principles

¶126  To begin, the "Utah Constitution enshrines principles, not application of those principles." *South Salt Lake City v. Maese*, 2019 UT 58, ¶ 70 n.23, 450 P.3d 1092. In *Maese,* we looked at the historical record to determine the scope of the constitutional right to a trial by jury. We rejected the city's arguments that "there is no right to a jury trial on a vehicular offense because there were no automobile offenses in the code at the time of statehood." *Id.* We said that such an argument "is tantamount to saying that there can be no jury trial in any case involving a computer crime because there were no computers at the time of statehood. The proper inquiry focuses on what principle the constitution encapsulates and how that principle should apply." *Id.*

¶127  The State asserts that the fact that there were anti-abortion laws in place at the time of statehood means that the Utah Constitution cannot protect any rights that SB 174 might infringe. But this potentially conflates applications of constitutional

---

[32] Quickening is when the mother can first feel the movement of the fetus, "usually somewhat before the middle of the period of gestation." *Quickening*, MERRIAM- WEBSTER'S, https://www.merri am-webster.com/medical/quickening (last visited July 19, 2024).

principles with the principles themselves.[33] Our interpretive task is to determine what principles the people of Utah enshrined in the constitution.[34] And once we determine those principles, it is our

---

[33] We have at times been guilty of the same mistake. *American Bush v. City of South Salt Lake* provides an example of this. 2006 UT 40, 140 P.3d 1235. American Bush asked this court to conclude that article I, section 15 of the Utah Constitution—our First Amendment analog—protects nude dancing. *Id.* ¶ 6. We reviewed the constitution's text, constitutional convention debate, the historical roots of the constitutional language, and the history of state freedom of speech provisions at the time of Utah's statehood. *See generally id.* ¶¶ 15–53. This caused us to conclude that "it was a well-established and widely recognized principle of constitutional law at the time of the drafting of the Utah Constitution that obscene speech was not protected speech." *Id.* ¶ 54. We then reasoned that because the people at the time of statehood considered nude dancing to be obscene, section 15 could not protect such expression. *Id.* ¶ 57. This type of analysis impermissibly conflates a principle with the application of that principle. The *American Bush* court should have recognized that the Utah Constitution does not protect obscene speech and then applied that principle to the conduct in question. That is, it should have then analyzed whether the dancing at issue in that case was obscene, not whether Utahns in 1895 would have considered it to be obscene.

The *American Bush* court's misstep is perhaps understandable because we decided that case more than a decade before we fully articulated the importance of distinguishing between principles and application of those principles. *See, e.g.*, *Maese*, 2019 UT 58, ¶ 70 n.23. Moreover, *American Bush* was decided in an era when our approach to constitutional interpretation was in flux. The year after we decided *American Bush*, two of the three justices who constituted the *American Bush* majority were part of a majority in another split decision wherein they agreed with the proposition that "Historical arguments may be persuasive in some cases, but they do not represent a *sine qua non* in constitutional analysis." *State v. Tiedemann*, 2007 UT 49, ¶¶ 37, 56, 162 P.3d 1106.

[34] "We don't seek to understand what the constitutional language meant at the time it entered the constitution because that language is imbued with magic. We seek to understand the original

(continued . . .)

duty to apply them to the cases before us. This is more than an academic exercise. Failure to distinguish between principles and application of those principles would hold constitutional protections hostage to the prejudices of the 1890s.

¶128 For example, if we failed to distinguish between principles and applications, a party could use Utah's history to argue that the Utah Constitution provides no protection for interracial marriage. The Utah Territory outlawed interracial marriage in 1888. 2 UTAH COMPILED LAWS § 5-5-2584(5) to (6) (1888) (declaring marriage void between a white person and a person of African or Asian descent). We did not see a published case challenging the prohibition's constitutionality until 1961, and even then, we did not analyze the statute's constitutionality.[35] *Thomas v. Children's Aid Soc'y of Ogden*, 364 P.2d 1029, 1032 (Utah 1961), *overruled on other grounds by Wells v. Children's Aid Soc'y of Utah*, 681 P.2d 199 (Utah 1984).

¶129 In 1963, the Legislature repealed the ban. *See* 1963 UTAH LAWS 162–63. Even among the repeal's supporters, there was division over whether the ban was constitutional. Some supporters advocated repeal because interracial couples were marrying outside Utah and then returning to the state. Thus, even in repeal, some legislators appeared to be motivated by the desire to avoid

---

public meaning because it is the best place to start to understand the principle the people of Utah placed in the constitution." *State v. Barnett*, 2023 UT 20, ¶ 58, 537 P.3d 212.

[35] It appears that Utah government officials applied interracial marriage laws, refusing to issue marriage licenses to interracial couples at least through the 1930s. *See, e.g., Marriage License Refused – Chinaman and a Woman of Mixed Blood Asked for It*, SALT LAKE TRIB., Sept. 16, 1898, at 6; *The License Was Refused – Colored Soldier's Attempt to Marry a Supposed White Woman*, DESERET EVENING NEWS, Oct. 26, 1899, at 4; *Couple Fight Snow-Blocked Passes to Wed in Utah, but Are Denied License*, SALT LAKE TELEGRAM, Jan. 17, 1931 at 2 (reporting that after consultation with the deputy county attorney, the county clerk denied a marriage license to a Filipino man and an "American" woman). A demonstrated commitment to enforcing unconstitutional laws does not render them constitutional.

litigation and not by constitutional concerns. *See* Anthony Michael Kreis, *Marriage Demosprudence*, 2016 U. ILL. L. REV. 1679, 1705 (2016).

¶130 Consequently, many Utahns at the time of statehood—and for a long time thereafter—would have opined that article I, section 24, which promises that "[a]ll laws of a general nature shall have uniform operation," provided no protection for interracial marriage. And someone could point to that understanding and the miscegenation laws on the books at the time of statehood, and for decades thereafter, as proof that the Utah Constitution does not guarantee equality in a way that protects every Utahn's right to marry a person of a different race. If we were to accept that approach to originalist inquiry, that could end the analysis. But we don't and it doesn't.

¶131 That is because we look to understand the principle embedded in the constitution and not how the people of Utah who put it in the constitution would have applied that principle. With respect to interracial marriage, the analysis is simple because article I, section 24 of the Utah Constitution plainly asserts the principle that laws of a general nature apply equally, and we have no reason to believe that the people of Utah understood that general principle any differently at the time of statehood. But we are not required to apply that principle in the same way the founding generation would have.[36]

¶132 Stated simply, while the laws that existed at the time of statehood may be evidence of the constitution's meaning, they do not end the analysis.

---

[36] Moreover, "even the first Legislature could have enacted an unconstitutional law." *See Maese*, 2019 UT 58, ¶ 46. To assume that statehood-era abortion laws comply with the principles enshrined in the constitution simply because they were enacted near the time of statehood would be a dereliction of our constitutional duty to interpret and uphold the constitution. *See* UTAH CONST. art. VIII, § 1 ("The judicial power of the state shall be vested in a Supreme Court . . . ."); *id.* § 2 (requiring "the concurrence of a majority of all justices of the Supreme Court" to declare a law unconstitutional).

b. The State's Historical Evidence May Not Fully Define the Principles the Utah Constitution Contains

¶133 The State's historical recitation is not dispositive for another reason: it may not give us a complete understanding of Utah's unique history and traditions. "When we look to the historical record, we hope that it resembles a Norman Rockwell painting—a poignant, straightforward, and easy to interpret representation." *Maese,* 2019 UT 58, ¶ 29. But often, "the historical record is more like a Jackson Pollock," and "we find ourselves staring at the canvas in hopes of finding some unifying theme." *Id.*

¶134 We want parties to present a complete view of the historical record to help us avoid the "pattern of asserting one, likely true, fact about Utah history and letting the historical analysis flow from that single fact." *State v. Tulley,* 2018 UT 35, ¶ 82, 428 P.3d 1005 (cleaned up). We worry that if we rely on an incomplete understanding of the founding era, we risk "converting the historical record into a type of Rorschach test where we only see what we are already inclined to see." *Id.* (cleaned up). The more robust our understanding of the history, the better we are at avoiding those traps.

¶135 This means that it is not enough to understand that Utah banned abortion at the time we became a state. To uncover the constitutional principle that the criminalization of abortion might speak to, we need to understand *why* Utah banned abortion at the time of statehood and *what* that can tell us about how the Utahns who voted the constitution into existence understood the relationship between them and their government. When this comes into view, we can then use the history to help define the principles the Utah Constitution contains.

¶136 The evidence the State put before the district court tells us something about what the people may have understood at the time of statehood, but it may not tell us everything.

¶137 The State asserts that the 1898 Utah Code prohibited a person from "provid[ing], suppl[ying], or administer[ing] to any pregnant woman . . . any medicine, drug, or substance, or uses or employs any instrument or other means whatever, with intent thereby to procure the miscarriage of such woman" unless it was necessary to save her life. (Quoting UTAH REV. STAT. § 75-27-4226 (1898).) The State also asserts that the code criminalized women

intentionally producing their own miscarriage. (Citing *id.* § 75-27-4227.) The State argues that in the founding era, miscarriage was "generally used and understood in common language" as "substantially the same" thing as abortion. It uses this court's decision in *State v. Crook* to support that contention and to define those terms. 51 P. 1091 (Utah 1898).

¶138 The State charged Joseph Crook with "procuring an abortion." *Id.* at 1092. The statute Crook was charged with violating was found under the title "Abortions" but used the following language:

> Every person who provides, supplies or administers to any pregnant woman, or procures any such woman to take any medicine, drug or substance, or uses or employs any instrument or other means whatever, with intent thereby to procure the *miscarriage of such woman*, unless the same is necessary to preserve her life, is punishable.

*Id.* at 1093 (emphasis added) (citing UTAH COMPILED LAWS § 6-2-5046 (1888)). We noted that article VI, section 23 of the Utah Constitution requires that a law's title clearly reflect its substance.[37] *Id.* To determine whether Crook had been unconstitutionally charged, we resorted to Webster's dictionary definition of abortion. *Id.* Webster's defined abortion as "the act of giving premature birth; particularly the expulsion of the human foetus prematurely, or before it is capable of sustaining life; miscarriage." *Id.* We proclaimed that "[a]s generally used and understood in common language, the 'procuring of an abortion' means substantially the same as 'procuring a miscarriage'. . . . but [that] the criminal act of destroying the foetus at any time before birth is usually termed in law procuring a miscarriage." *Id.*

¶139 The State uses *Crook*'s discussion to argue that near the time of statehood, Utahns would have understood that abortion and miscarriage were synonymous terms and that a miscarriage meant the expulsion of a fetus at any time before birth. Although

---

[37] Section 23, as it existed in Utah's first constitution, is now found in article VI, section 22, which in part requires that "no bill shall be passed containing more than one subject, which shall be clearly expressed in its title."

the State does not explicitly argue the import of what we said in *Crook*, presumably the State highlights this discussion to blunt any argument that Utahns in 1895 would have drawn a distinction between pre- and post-quickening abortions. And the State appears to use this evidence to argue that criminalization of abortion at statehood means that the Utah Constitution could not contain any right that could be infringed by a restriction on a pre-quickening abortion.

¶140 There is a potential issue with using this sliver of history as definitive proof of what Utahns understood at the time of statehood. *Crook* does not explain why we looked to Webster's and not another dictionary to define abortion. This is important because if we had looked to the 1895 version of the Century Dictionary, for example, we would have seen that it defined abortion as:

> 1. Miscarriage; the expulsion of the fetus before it is viable—that is, in women, before about the 28th week of gestation. Expulsion of the fetus occurring later than this, but before the normal time, is called (when not procured by art, as by a surgical operation) premature labor. A somewhat useless distinction has been sometimes drawn between abortion and miscarriage, by which the former is made to refer to the first four months of pregnancy and the latter to the following three months. Criminal abortion is premeditated or intentional abortion procured, at any period of pregnancy, by artificial means, and solely for the purpose of preventing the birth of a living child; feticide. *At common law the criminality depended on the abortion being caused after quickening.* Some modern statutes provide otherwise.

*Abortion*, THE CENTURY DICTIONARY: AN ENCYCLOPEDIC LEXICON OF THE ENGLISH LANGUAGE 16 (William D. Whitney & Benjamin E. Smith, eds. 1895), https://archive.org/details/centurydict01whit /page/16/mode/2up (cleaned up) (emphasis added). A Utahn whose understanding mirrored the common law understanding the Century Dictionary describes would not have necessarily

believed that the Utah law outlawing abortion banned any action to end a pregnancy at any time during the pregnancy.[38]

¶141  We take the State's point that *Crook* considered abortion to "mean[] substantially the same" as miscarriage. But *Crook* is a single data point that may not have reflected the common understanding of the time. In other words, there are questions about whether statehood-era Utahns understood that it was criminal to intentionally terminate a pregnancy from the moment of conception, as opposed to being criminal only after quickening.

¶142 Indeed, some historical sources point to a different conclusion than the one the State reaches. For example, Hannah Sorensen, a female physician who practiced in Utah in the 1890s, authored a book that recounts that some Utah women did not consider abortion at all stages of pregnancy to be wrongful. Sorensen offered lectures and classes on female health. Part of Sorensen's instruction discouraged the idea that it was acceptable to have an abortion before quickening. *See* Amanda Hendrix-Komoto, *The Other Crime: Abortion and Contraception in Nineteenth- and Twentieth-Century Utah*, DIALOGUE: J. MORMON THOUGHT, Spring 2020, at 33, 40. Based on her interactions with Utah women, Sorensen wrote that it "is considered by some no sin to destroy the foetus in the early months," and that others "believe[d] it a sin to destroy offspring in the first months of pregnancy; but not sin to use means whereby to prevent conception, and they take that course." HANNAH SORENSEN, WHAT

---

[38] Though it is unclear how much stock Utahns put in this, or any, dictionary, at least a few Utahns were aware of its existence. In the 1890s, the Salt Lake Herald-Republican and the Ogden Daily Standard mentioned the Century Dictionary. *Local News*, SALT LAKE HERALD-REPUBLICAN, Nov. 22, 1896, at 4; *Three Long Words*, OGDEN DAILY STANDARD May 14, 1892, at 3. Moreover, United States Supreme Court justices of the 1890s era cited the Century Dictionary in twelve opinions. *See generally* Samuel Thumma & Jeffrey L. Kirchmeier, *The Lexicon Has Become a Fortress: The United States Supreme Court's Use of Dictionaries*, 47 BUFF. L. REV. 227, 263 & app. A (1999). Also of note, Justice Scalia has stated that the Century Dictionary is one of the four most useful and authoritative dictionaries for the era. ANTONIN SCALIA & BRYAN A. GARNER, READING LAW: THE INTERPRETATION OF LEGAL TEXTS 422 app. (2012).

WOMEN SHOULD KNOW 81 (1896), available at https://babel.hathitrust.org/cgi/pt?id=uc2.ark%3A%2F13960%2Ft4vh5gw7j&.

¶143  What Sorensen described—some Utah women seemingly believing that termination of a pregnancy before quickening was not wrongful—appears to have been a line that residents of other states drew as well. *See State v. Murphy*, 27 N.J.L. 112, 114 (Sup. Ct. 1858) ("At the common law, the procuring of an abortion, or the attempt to procure an abortion, by the mother herself, or by another with her consent, was not indictable, unless the woman were quick with child. The act was purged of its criminality, so far as it affected the mother, by her consent. It was an offence only against the life of the child."); JAMES C. MOHR, ABORTION IN AMERICA: THE ORIGINS AND EVOLUTION OF NATIONAL POLICY, 1800–1900, at 21–22 (1978) (reporting that in 1821, Connecticut passed the first abortion law in the United States and explicitly limited abortion prosecution to only if a woman was "quick with child," thus preserving "for Connecticut women their long-standing common law right to attempt to rid themselves of a suspected pregnancy they did not want before the pregnancy confirmed itself").

¶144  Sorensen's book reveals that the definition of abortion the State proffers as definitive may not have been commonly shared. Some, like Sorensen, believed the intentional abortion of a fetus always to be criminal; others believed intentional abortion to be criminal after quickening.

¶145  In addition, the State's evidence does not necessarily demonstrate that abortion was illegal at statehood because Utahns understood that a woman lacked the legal ability to decide whether to carry a pregnancy to full term. There is evidence suggesting that concern for the life of the mother motivated, at least in part, abortion bans. *See, e.g.*, Tracy A. Thomas, *Misappropriating Women's History in the Law and Politics of Abortion*, 36 SEATTLE U. L. REV. 1, 21 (2012). Tracy Thomas writes that "early legislation" (taking place around 1841) "continued to focus on medical malpractice and protection of the life and health of the mother from the consequences of abortion." *Id.*

¶146  This is consistent with the Supreme Court of New Jersey's discussion of its 1858 abortion law, stating that "[t]he design of the statute was not to prevent the procuring of abortions, so much as

to guard the health and life of the mother against the consequences of such attempts."[39] *Murphy*, 27 N.J.L. at 114.

¶147 The history of Connecticut's nineteenth-century abortion ban is informative. In 1821, Connecticut outlawed "wil[l]fully and maliciously, administer[ing] to . . . any person or persons, any deadly poison, or other noxious and destructive substance, with an intention . . . to cause or procure the miscarriage of any woman, then being quick with child . . . ." MOHR, *supra* ¶ 143, at 21 (citing 22 CONN. PUB. STAT. § 14 (1821)). Mohr notes that Connecticut did not outlaw abortion per se, but instead outlawed one specific abortion method because it was "prohibitively unsafe owing to the threat of death by poisoning," and that surgical abortions remained legal. *Id.* at 22.

¶148 Some scholars also suggest that the push for anti-abortion laws that determined fetal life started from conception was a way to standardize the medical profession. Thomas writes: "The lobbying effort to criminalize abortion was spearheaded by the medical profession." Thomas, *supra* ¶ 145, at 21. Doctors "claim[ed] pregnancy as an area solely for medical expertise. . . . Quickening, the physicians argued, could not be relied upon as an indicator of fetal life because it did not occur at a standard moment." *Id.* at 21–22. Reva Siegel writes that "[d]uring the period of the criminalization campaign, the gynecologists and obstetricians of the AMA [American Medical Association] were seeking to appropriate management of the birthing process from midwives, and to prevent women from entering the medical profession." Reva Siegel, *Reasoning from the Body: A Historical Perspective on Abortion Regulation and Questions of Equal Protection*, 44 STAN. L. REV. 261, 300

---

[39] A few newspaper articles from Utah in the 1890s reference abortion and the doctors implicated as being charged with medical malpractice. *See Local and Other Matters*, DESERET WEEKLY, July 21, 1894, at 16 (reporting that a jury considering "premature birth" charges found that the fetal death "was the result of criminal malpractice"); *An Embryo Sensation – Charges Made Against A Doctor and Patient – Coroner Investigating a Case of Premature Birth – Grand Jury's Attention May Be Called to It*, SALT LAKE TRIB., Sept. 27, 1895, at 5 (coroner noting that "it is with extreme difficulty that indictments under the laws relating to malpractice have been sustained").

(1992). The period Thomas and Siegel examine—the 1850s to the 1880s—parallels the founding of the Utah Territory and its development toward statehood. *See* Thomas, *supra* ¶ 145, at 21; Siegel, *supra* at 286 (discussing the AMA's 1859 resolution "condemning abortion as an unwarranted destruction of human life" and the AMA's 1860s campaign to save "the nation from the evils of abortion" (cleaned up)).

¶149 To be sure, at this juncture, we do not have a full picture of what conduct statehood-era Utahns prohibited when they put abortion laws on the books. Nor do we fully understand the "presuppositions and silent logical connectives" that influenced why they enacted these laws. *See Neese v. Utah Bd. of Pardons & Parole*, 2017 UT 89, ¶ 100, 416 P.3d 663 (cleaned up).

¶150 If we are to ultimately use the criminal statutes the State relies on to help interpret the constitution, we need to understand what conduct they criminalized and the motivation for enacting the laws. This is the evidence that will inform what the understanding was and whether that influenced the protections the people of Utah placed into the constitution. And it is this evidence that will allow a court to interpret the constitution consistent with the principles that those who enacted it intended it to contain.

¶151 For the purpose of reviewing the district court's conclusions under the preliminary injunction standard, it is enough to recognize that the laws at the time of statehood do not necessarily provide the full portrait of what the people of Utah understood when they approved the Utah Constitution. Nor does it tell us how that understanding informs the protections the Utah Constitution contains. The district court did not err when it concluded that serious issues that merit further examination exist.

c. The State's Historical Evidence from Outside Utah Is Not Dispositive

¶152 The State posits that we should defer to the United States Supreme Court's statements about abortion recited in *Dobbs.* While *Dobbs*'s historical discussion may have persuasive force, it does not end the inquiry.

¶153 The focus of *Dobbs*'s inquiry differs from what PPAU's challenge presents. The *Dobbs* court analyzed the nation's history and tradition regarding abortion, focusing primarily on the nation's laws in 1868, the year the Fourteenth Amendment was

ratified. *Dobbs v. Jackson Women's Health Org.*, 597 U.S. 215, 248–50 (2022). To interpret the Utah Constitution, we are required to examine how the people of Utah at the time of statehood would have understood the principles our founding document enshrined.

¶154 *Dobbs*'s historical recitation does not directly speak to Utahns' understanding of the Utah Constitution. Nor does *Dobbs* consider the unique circumstances of Utah's founding and the possibility that those who fled to what became Utah may have carried with them understandings about government overreach into one's personal decisions that influenced what Utahns at the time of statehood thought their state constitution should protect. *See generally* John J. Flynn, *Federalism and Viable State Government: The History of Utah's Constitution*, 1966 UTAH L. REV. 311 (1966). Nor does *Dobbs* consider the Utah-specific evidence, a portion of which we discuss above.

¶155 The upshot is that while the history *Dobbs* recites is something that the parties can advance to help interpret the Utah Constitution, it may not tell us all we need to know to understand what our state constitution means.

¶156 Although this disposes of the State's primary criticisms of the district court's order, the State also takes issue with other conclusions the court made about the Utah Constitution and the rights it protects. We address these next.

4. The District Court Did Not Err When It Concluded that Serious Issues Exist Regarding SB 174's Alleged Infringements on a Right to Bodily Integrity

¶157 Before the district court, PPAU argued that SB 174 violated "the fundamental right of pregnant Utahns to bodily integrity." PPAU argued this right can be found in article I, sections 1, 7, 11, and 14 of the Utah Constitution. Section 1 declares, among other things, that "[a]ll persons have the inherent and inalienable right to enjoy and defend their lives and liberties." Section 7 provides "No person shall be deprived of life, liberty, or property, without due process of law." Section 11—known as the Open Courts Clause—states that "[a]ll courts shall be open, and every person, for an injury done to the person in his or her person . . . shall have remedy by due course of law." And section 14 prohibits unreasonable searches.

¶158  PPAU contended that because SB 174 "forc[es] someone to remain pregnant against their will," it offends a right to bodily integrity. It argued that SB 174 exposes pregnant people to "increased physical risk, including an increased risk of death, and more invasive medical interventions such as delivery by C-section." PPAU claimed that "the right to bodily integrity undoubtedly protects one's ability to be free from nonconsensual 'harmful or offensive contact.'" (Quoting *Wagner v. State*, 2005 UT 54, ¶ 51, 122 P.3d 599.) It also asserted that the right to bodily integrity "underpins the common-law doctrine of informed consent in medical decision making" that Utah has recognized. (Citing *Nixdorf v. Hicken*, 612 P.2d 348, 354 (Utah 1980).)

¶159  The district court determined that PPAU demonstrated serious issues on the merits of whether SB 174 infringes a "right to bodily integrity [protected] under article I, sections 1, 7, and 11 of the Utah Constitution."[40]

¶160  The State contends that the district court erred because we have disapproved of reading into the Utah due process clause "any rights 'not mentioned in the Constitution' where they were 'unknown at common law' and not 'deeply rooted in th[is] [N]ation's history and tradition.'" (Quoting *In re J.P.*, 648 P.2d 1364, 1375 (Utah 1982).) In other words, the State claims that we cannot conclude an unenumerated or substantive due process right exists unless the common law and history support such a conclusion. And the State argues that the common law and history do not support the existence of an implied fundamental right to bodily integrity when "[r]ecast[] [as] abortion." This argument is mostly a rehash of the argument that we should define constitutional rights narrowly. For the reasons discussed above, this is inconsistent with how we have approached questions of constitutional interpretation. *See supra* Part II.A.2.

¶161  We have recognized that the Utah Constitution contemplates some protection for decisions regarding one's own body. *See, e.g.*, *Jensen ex rel. Jensen v. Cunningham*, 2011 UT 17, ¶ 73, 250 P.3d 465; *Nixdorf*, 612 P.2d at 354. *Jensen*, for example, dealt with

---

[40] The court also cited *Malan v. Lewis*, 693 P.2d 661, 674 n.17 (Utah 1984) and *Wood v. University of Utah Medical Center*, 2002 UT 134, 67 P.3d 436, *abrogated on other grounds by Waite v. Utah Lab. Comm'n,* 2017 UT 86, 416 P.3d 635.

parents who refused to allow their 13-year-old son to receive chemotherapy after he was diagnosed with a cancerous tumor expected to be fatal if left untreated. 2011 UT 17, ¶¶ 7–9, 31. The Jensens resisted court orders for their son to undergo chemotherapy and fled Utah with their son. *Id.* ¶¶ 24–30. The State charged the Jensens with custodial interference and kidnapping. *Id.* ¶ 28. The Jensens eventually entered into a plea agreement, and the State ended its pursuit to force the Jensens' son to undergo chemotherapy. *Id.* ¶ 31. The Jensens sued the State and various other parties for violating their rights under the federal and Utah constitutions—specifically relevant here, their rights under article I, sections 1, 7, 14, and 25 of the Utah Constitution. *Id.* ¶ 32.

¶162  The Jensens claimed that "article I, sections 1 and 7 vest in parents a right to direct their child's medical care free from governmental interference" unless the government action can survive strict scrutiny. *Id.* ¶ 70. When plaintiffs seek money damages for constitutional violations, they must show several elements, including that they suffered a "flagrant violation" of their constitutional rights. *Id.* ¶ 65. The Jensens lost their case because they failed to show that they suffered "flagrant violations" of their constitutional rights. *See id.* ¶¶ 86, 89, 94, 97.

¶163 But to reach that conclusion, we noted the well-established precedent recognizing "parental rights as a fundamental component of liberty protected by article I, section 7." *Id.* ¶ 72. We quoted our statement from *In re J.P.* that a parent's inherent right to raise his or her children is a "fundamental axiom[] of Anglo-American culture, presupposed by all our social, political, and legal institutions." *Id.* (quoting 648 P.2d at 1373).

¶164 We noted that *In re J.P.*'s "holding[] do[es] not directly embrace a broader, more encompassing fundamental right to direct medical care." *Id.* ¶ 73. We also acknowledged that "the Jensens [had] not cited to any other authority—from this or any other jurisdiction—that squarely supports such an expansive reading of article I, section 7 [of the Utah Constitution]." *Id.* We nevertheless concluded that "it is clear from our precedent that parents have a fundamental right to make decisions concerning the care and control of their children. And this general right necessarily encompasses the more specific right to make decisions regarding the child's medical care." *Id.*

¶165 Partially because parents "have long viewed their offspring as somehow being an extension of themselves," at their core, *In re J.P.* and *Jensen* recognize that the Utah Constitution protects a fundamental right to make those decisions for a child that parents can make for themselves. *In re J.P.*, 648 P.2d at 1376 (cleaned up). And a fundamental right to make medical decisions about a child presupposes a fundamental right to make medical decisions about oneself.

¶166 There are three lessons to take from *Jensen* relevant to the State's argument. *Jensen* first reinforces the conclusion that we sometimes define constitutional rights as broad principles that "necessarily encompass[] the more specific right." 2011 UT 17, ¶ 73. Second, we have not required parties to show precise historical antecedents for the application of the constitutional principle to a specific right. Third, the right to make medical decisions that *Jensen* recognizes resembles the right to bodily integrity that PPAU argued to the district court. [41]

¶167 *Jensen* is not the only case that supports PPAU's bodily integrity claim. Although we did so in the context of interpreting the federal constitution, we also discussed the constitutional dimensions of the ability to make one's own medical decisions in *In re Boyer*, 636 P.2d 1085 (Utah 1981). In that case, a jury found that Nelda Boyer was incapacitated because of her mental disability and concluded that a guardian needed to be appointed for her. *Id.* at 1086–87. On appeal, Boyer argued that decision deprived her of a constitutionally guaranteed right to make certain personal decisions. *Id.* at 1087.

¶168 We resolved the case by analyzing whether the incapacity statute "impinge[d] on fundamental rights" under the federal due process clause. *Id.* at 1087–88. We concluded that the incapacity statute was not vague and overbroad because it accomplished the statute's basic purpose "without improperly impinging on an individual's liberties of self-determination, right of privacy, right to travel, or right to make one's own educational and medical

---

[41] The parties do not dispute that the decision to have an abortion can be characterized as a medical decision. The American College of Obstetricians and Gynecologists' *amicus* brief describes a woman's decision to have an abortion as a medical one she makes with the advice of a doctor.

decisions." *Id.* at 1089. Although we did not undertake an analysis of the Utah Constitution to resolve *In re Boyer*, our recognition of an individual's fundamental right under the federal constitution to make one's own medical decisions raises serious issues about whether the similarly worded provision of the Utah Constitution also protects this right.

¶169 PPAU also points to *Nixdorf v. Hicken* as a case that recognizes a right to bodily integrity. *Nixdorf* was a medical malpractice case where a surgeon left a suturing needle inside the patient, was aware of the mistake, and failed to inform the patient. 612 P.2d at 351. We held that the district court erred when it did not submit to the jury the plaintiff's cause of action concerning the failure to disclose the presence of the needle because the plaintiff had a "right to determine what shall or shall not be done with his body." *Id.* at 354.

¶170 *Nixdorf* relied on cases from New York and Washington to reach its conclusion. *Id.* at 354 n.19. In *Schloendorff v. Society of N.Y. Hospital*, a volunteer surgeon at the defendant's hospital operated on the plaintiff without her consent while she was under anesthesia for a related investigatory observation. 105 N.E. 92, 92–93 (N.Y. 1914), *abrogated on other grounds by Bing v. Thunig*, 143 N.E.2d 3 (N.Y. 1957). The New York Court of Appeals declared "Every human being of adult years and sound mind has a right to determine what shall be done with his own body; and a surgeon who performs an operation without his patient's consent commits an assault, for which he is liable in damages." *Id.* at 93. For this declaration, *Schloendorff* cited *Mohr v. Williams*, 104 N.W. 12 (Minn. 1905), *overruled on other grounds by Genzel v. Halvorson*, 80 N.W.2d 854 (Minn. 1957). *Mohr* recognized that "[u]nder a free government, at least, the free citizen's first and greatest right, which underlies all others [is] the right to the inviolability of his person" and that control over one's body "is the *natural right of the individual, which the law recognizes as a legal one*." *Id.* at 14–15 (cleaned up) (emphasis added).

¶171 *Miller v. Kennedy* was a medical malpractice case where the plaintiff claimed that the trial court's informed consent instruction to the jury wrongfully placed the burden of proving failure to warn a patient about a material risk on the plaintiff. 522 P.2d 852, 859 (Wash. Ct. App. 1974), *aff'd*, 530 P.2d 334 (Wash. 1975). *Miller* concluded that

> The patient is entitled to rely upon the physician to tell him what he needs to know about the condition of his own body. The patient has the right to chart his own destiny, and the doctor must supply the patient with the material facts the patient will need in order to intelligently chart that destiny with dignity.

*Id.* at 860. When we declared in *Nixdorf* that a patient has a "right to determine what shall or shall not be done with his body," we quoted this language from *Miller*. *Nixdorf*, 612 P.2d at 354 & n.19.

¶172 The State argues that *Nixdorf* is inapplicable because it "did not interpret any constitutional provision" and merely resolved a tort dispute. The State correctly asserts that *Nixdorf* did not expressly interpret the Utah Constitution when it declared that a person has a "right to determine what shall or shall not be done with his body." *Id.* at 354. But the language we used and the cases we cited suggest a constitutional basis for the right to determine what will be done with one's body. At a minimum, *Nixdorf*, together with *Jensen* and *In re Boyer*, raise a serious issue regarding the existence of a right to bodily integrity and whether SB 174 infringes that right.

5. The District Court Did Not Err When It Concluded that Serious Issues Exist Regarding SB 174's Alleged Infringements on a Right to Make Decisions About One's Family Free from Undue Government Interference

¶173 PPAU claimed before the district court that SB 174 infringed a "natural" and "fundamental right to determine one's family composition and to decide for oneself and one's family how best to care for one's existing children." The district court concluded that PPAU demonstrated serious issues on the merits of whether SB 174 infringes on a "right to determine one's family composition under article I, sections 2, 25, and 27 of the Utah Constitution." The district court stated that *In re J.P.* meant that there exists "at least a reasonable argument to extend decisions relating whether to have a child, to family decisions and family rights such as the relationship of parent to child." *See In re J.P.*, 648 P.2d 1364, 1372–74 (Utah 1982).

¶174 As we have discussed, *In re J.P.* held that the Utah Constitution protects "the inherent and retained right of a parent to maintain parental ties to his or her child." *Id.* at 1377. *In re J.P.*

recognized that one of the basic principles for which government is established is to guarantee an individual's "right to form and preserve the family." *Id.* at 1373 (cleaned up). PPAU and the State disagree over whether an inference can be drawn from *In re J.P.* that one has constitutional rights to *not form* a family and to preserve one's family as it stands.

¶175 In *In re J.P.*, we recognized that people had a well-established natural and intrinsic right to marry and that the right to procreate was among the "basic civil rights of man." *Id.* (first citing *Loving v. Virginia*, 388 U.S. 1, 12 (1967); and then quoting *Skinner v. Oklahoma ex rel. Williamson*, 316 U.S. 535, 541 (1942)). *In re J.P.* also declared that individuals had a right to "establish a home and bring up children." *Id.* at 1372 (quoting *Meyer v. Nebraska*, 262 U.S. 390, 399 (1923)). And we concluded that "[t]o protect the individual in his constitutionally guaranteed right to form and preserve the family is one of the basic principles for which organized government is established." *Id.* at 1373 (cleaned up) (quoting *Lacher v. Venus*, 188 N.W. 613, 617 (Wis. 1922)).

¶176 The State first argues that though *In re J.P.* protects a parent's rights to "maintain and preserve [their] ties to their children," it cannot "support [PPAU's] claimed right to *prevent* that very parent-child relationship from existing in the first place." The State supports its assertion by claiming that the rights underlying *In re J.P.*'s conclusion "presupposes parents with a living child" and that "[a]bortion is inconsistent with that presupposition." Even if some of *In re J.P.'s* language could be used to argue that presupposition exists, the rights that case recognized are bound together by a basic principle: autonomy over decisions concerning one's family. That is, *In re J.P.* discussed, among other rights, the right to marry the person of one's choosing and the right to establish a home. *Id.* at 1372. The commonality these rights share is not a child, but the right to make certain intimate decisions about one's life free from government intrusion. At this point in the litigation, we cannot say whether a restriction on the ability to choose to have an abortion infringes the rights we recognized in *In re J.P.*, but there are serious questions regarding the scope of those rights that merit further litigation.

¶177 The State next contends that *In re J.P.* "expressly rejected the reasoning and conclusions of 'substantive due process cases like *Roe.'"* (Quoting 648 P.2d at 1375.) According to the State, any

rights *In re J.P.* recognizes cannot include a right to choose to have an abortion. The State further argues that because *In re J.P.* supports its reasoning with United States Supreme Court Fourteenth Amendment caselaw, and *Dobbs* "confirm[ed] there is no Fourteenth Amendment right to abortion," PPAU cannot avail itself of any fundamental right *In re J.P.* discussed.

¶178  To be sure, the *In re J.P.* court distinguished its analytical path from that in *Roe v. Wade*, 410 U.S. 113 (1973). We emphasized that unlike the unenumerated right to privacy that *Roe* used to "establish other rights unknown at common law," our review of the historical record showed that the parental right at issue in *In re J.P.* was "fundamental to the existence of the institution of the family, . . . deeply rooted in this Nation's history and tradition, . . . and in the history and culture of Western civilization." 648 P.2d at 1375 (cleaned up). *In re J.P.* does not say that the Utah Constitution could not include a right that would protect the ability to choose to have an abortion; it instead noted that we believed that the path the United States Supreme Court took to recognize a right to privacy was suspect. *In re J.P's* observation does not prevent PPAU from attempting to convince the district court that the Utah Constitution protects rights that SB 174 infringes.

¶179  In the end, the right PPAU argues the Utah Constitution protects is rooted in the same soil as the principles that we recognized in *In re J.P.*[42] The possibility that an unenumerated right to make decisions about one's family free from undue government interference may be found in the same constitutional principles we recognized in *In re J.P.* means that the district court did not err when it concluded that there exist serious issues on the merits which should be the subject of further litigation.

---

[42] The State argues that PPAU has failed to offer an original public meaning analysis of the Utah Constitution to support a fundamental right to make decisions about one's family free from undue government interference. On remand, the parties are free to engage in an original public meaning analysis as to the scope of the rights *In re J.P.* recognizes. But, for rule 65A purposes, our prior recognition of a right to form and preserve one's family is sufficient to raise serious issues speaking to the merits of PPAU's claim to justify the injunction.

6. The District Court Did Not Err When It Concluded that Serious Issues Exist Regarding Whether SB 174 Infringes on the Equal Rights Provision of the Utah Constitution

¶180 The Utah Constitution's Equal Rights provision states, "The rights of citizens of the State of Utah to vote and hold office shall not be denied or abridged on account of sex. Both male and female citizens of this State shall enjoy equally all civil, political and religious rights and privileges." UTAH CONST. art. IV, § 1. PPAU argued before the district court that SB 174 violated this provision because its "disproportionate effects [on women] flatly undermine women's equal privileges of citizenship." PPAU asserted that SB 174 "treats men and women differently, or . . . disproportionately impairs women's ability to fully enjoy their privileges and civil, political, and religious rights."

¶181 PPAU provided examples of SB 174's anticipated effects that it argued would infringe on women's "civil, political, and religious rights." PPAU contended that SB 174 "disproportionately limits women's bodily autonomy and liberty, their ability to decide for themselves matters of great consequence to their lives, and their ability to obtain the same education and financial independence available to those who cannot become pregnant."

¶182 The district court held that PPAU demonstrated serious issues on the merits of whether SB 174 infringes on the rights protected by "Utah's Equal Rights Amendment (article IV, section 1 of the Utah Constitution.)"[43]

¶183 The State argues that article IV, section 1 is nothing more than a "voting-rights provision."[44] The State contends that the

---

[43] In its oral order, the court stated "There is an argument here that this Act treats classes of people differently and there is potentially a violation there of Article I, Section 1; Article IV, Section 1 [Equal Rights provision]; Article I, Section 24 [Uniform Operation of Laws provision]." We offer no opinion on PPAU's section 24 argument.

[44] The State also claims that, to the extent article IV, section 1 confers rights not directly tied to suffrage, the "general public in 1896 did not understand abortion to be [expressly] one of those 'civil, political, and religious rights and privileges.'" (Citing UTAH

(continued . . .)

second sentence of section 1 guarantees that "both sexes would equally use that [political] process to specify what further 'civil,' 'political,' or 'religious' rights men and women would equally enjoy." The State urges that "the convention statements on gender equality that PPAU cited in district court, . . . were made in the context of advocating for article IV, section 1 as a voting-rights provision." The State further offers that newspapers at the time reflect that same understanding. (Citing *Women and the Ballot*, SALT LAKE HERALD-REPUBLICAN, Mar. 29, 1895, at 3 (recounting that "the suffrage question was the all-absorbing topic for debate" at the convention the day before).)

¶184 Article IV, section 1's plain language would appear to defeat the State's argument. While the first sentence of the provision speaks to voting rights, the second sentence—with its reference to equality in "all civil, political and religious rights and privileges"—sweeps far more broadly. We normally presume that the drafters of the Utah Constitution chose their words carefully. That causes us to avoid interpretations that would treat an entire clause as surplusage. *See, e.g.*, *United States v. Butler*, 297 U.S. 1, 65 (1936) (declining to interpret language detailing Congress's tax and spending powers as surplusage because "[t]hese words cannot be meaningless, else they would not have been used"); ANTONIN SCALIA & BRYAN A. GARNER, READING LAW: THE INTERPRETATION OF LEGAL TEXTS 174 (2012). But when we interpret the constitution, we don't necessarily stop our analysis when the document's plain language suggests an answer. In *South Salt Lake City v. Maese*, we explained that while

> the text is generally the best place to look for understanding, historical sources can be essential to our effort to discern and confirm the original public meaning of the language. Although the text's plain language may begin and end the analysis, unlike contract interpretation, constitutional inquiry does not require us to find a textual ambiguity before we turn to those other sources. Where doubt exists about the constitution's meaning, we can and should

---

CONST. art. IV, § 1.) For the reasons discussed above, this may conflate the constitutional principle with the application of that principle. *See supra* Part II.A.3.a.

> consider all relevant materials. Often that will require a deep immersion in the shared linguistic, political, and legal presuppositions and understandings of the ratification era.

2019 UT 58, ¶ 23, 450 P.3d 1092 (cleaned up). This is because language can change meaning over time and what seems plain to us today might have had a different import when it was written.[45]

¶185 So here, even though the plain text of the equal rights provision speaks to more than just equal suffrage, we must remain open to the possibility that someone might establish that the constitutional language describes a principle narrower than it appears when we read it today. That is, we cannot dismiss out of hand the State's assertion that the reference to equal "civil, political and religious rights and privileges" was just another way of saying "equal right to vote."

¶186 But what the State offers to prove its point is less than conclusive. When we look at the entirety of the convention debate, it becomes clear that some delegates thought the provision guaranteed more than just women's suffrage. This is especially clear from the comments of those who opposed the amendment.

¶187 For example, one opponent read a quote from the First Lady of Georgia opining, "This question by those advocating woman's suffrage is misstated when they ask for equal rights, for women exercise a great number of rights, a few of which are unequal in responsibility by any that men hold. Men and women may have equal rights and not yet possess the same rights." 1 OFFICIAL REPORT OF THE PROCEEDINGS AND DEBATES OF THE CONVENTION 467 (Star Printing Co. 1898 ed.) [hereinafter CONVENTION DEBATES].

---

[45] We have noted that the meaning of language changes over time. *See, e.g.*, *State v. Reyes*, 2005 UT 33, ¶ 38 & n.3, 116 P.3d 305 ("history has proven that defining 'beyond a reasonable doubt' is a process of evolution and adaptation," and "instructions that once enjoyed widespread acceptance [can] bec[o]me anachronistic and inaccurate due to shifting definitions of terms"); *State v. Gallegos*, 2020 UT 19, ¶ 58, 463 P.3d 641 ("Language matters and, over time, even small variations can take on lives of their own and distort the analysis.").

¶188 A delegate supporting equal suffrage, but not equal rights stated,

> We are here to formulate fundamental principles, and the balance should be left for the Legislature to arrange in the future. We are not here to enact all the laws that are necessary, but simply to formulate that fundamental principle upon which laws shall be founded. I am in favor of suffrage, but I am not in favor of granting to women all the rights that men enjoy. I don't think that the ladies of this Territory ask for all those rights and privileges.

*Id.* at 553.

¶189 In response to one of the chief opponents of the equal rights provision—a delegate who advocated that the lack of equal suffrage was a divine commandment—another delegate proclaimed that he supported the equal rights provision because Christian scripture provides that "Woman, thou art man's equal and companion, together thou shalt travel the journey of life, and enjoy equally with him all rights and privileges." *Id.* at 568. These excerpts from the convention debates suggest that both proponents and opponents of article IV, section 1 were aware that article IV guaranteed women more than equal voting rights. [46]

---

[46] Examples from other state constitutions support this conclusion. Wyoming guaranteed equal rights to men and women before Utah did. Wyoming's 1890 constitution stated, "Since equality in the enjoyment of natural and civil rights is only made sure through political equality, the laws of this state affecting the political rights and privileges of its citizens shall be without distinction of race, color, sex." WYO. CONST. art. I, § 3. Like the Utah Constitution, Wyoming's constitution also provided, "The rights of citizens of the State [] to vote and hold office shall not be denied or abridged on account of sex. Both male and female citizens of this state shall equally enjoy all civil, political and religious rights and privileges." *Id.* art. VI, § 1. The delegates to Utah's constitutional convention referred to the Wyoming provision when they debated the Equal Rights Provision. *See* CONVENTION DEBATES, *supra* ¶ 187, at 469, 540, 570, 587, 606.

(continued . . .)

¶190 The historical record is far richer than the convention statements and newspaper articles the State points to in hopes of limiting article IV, section 1 to less than its text suggests. There are ample examples of delegates who advocated an understanding that the provision meant what it appears to say and guaranteed Utah women equal civil, political, and religious rights and privileges. And, of course, as we have discussed, the relevant inquiry encompasses more than just what the delegates to the convention thought the language meant. The burden will ultimately fall to PPAU to demonstrate that SB 174 infringes on the rights this provision protects. But for the purposes of a preliminary injunction, the district court did not err when it concluded that there are serious issues concerning the meaning of the Equal Rights provision and whether SB 174 infringes on the rights it guarantees.

*B. The District Court Did Not Abuse Its Discretion When It Determined that PPAU, and Its Patients, Would Be Irreparably Harmed Without the Preliminary Injunction*

¶191 The district court determined that PPAU "made a strong showing that . . . [SB 174] will cause irreparable harm to PPAU, its patients, and its staff." The court pointed to: (1) the physical, emotional, and financial costs of being forced to carry a pregnancy that a person has decided to end; (2) the threats to safety and health for Utahns who turn to self-managed abortions; (3) delayed care and additional physical, emotional, and financial costs on those who seek an abortion out of state; (4) the delayed care for women who meet an exception to SB 174, resulting from the process for

---

California's 1879 constitution stated that "No person shall, on account of sex, be disqualified from entering upon or pursuing any lawful business, vocation, or profession." CAL. CONST. art. XX, § 18 (1879). The 1879 constitution, however, only granted male suffrage. *Id.* art. II, § 1. Californian women waited thirty-two years before voters passed Proposition 4 and guaranteed women the vote. *See* CAL. CONST. art. II, § 1 (1911).

Our framers did not expressly guarantee equal rights to people of all races the way Wyoming did. CONVENTION DEBATES, *supra* ¶ 187, at 614. But our framers guaranteed women's right to vote, unlike California. This suggests that those who debated article IV, section 1 understood the difference between equal rights and equal voting rights.

approval; and (5) the threat of criminal and licensing penalties, reputational harm, and harm to the livelihoods of PPAU and its staff.

¶192 The State argues that the district court erred in two ways. The State first argues that the district court erred when it considered the harm to PPAU's patients in its irreparable harm analysis. According to the State, this was error because the patients "are not parties to this case and PPAU has no standing to press their rights." To support its assertion, the State points to rule 65A's language, asserting that "a preliminary injunction may issue 'only' if the applicant shows . . . *it* will suffer irreparable harm absent the injunction."[47] (Emphasis added.)

¶193 When a plaintiff has standing to assert the rights of third parties, the interests of the plaintiff and the third party are aligned to the extent that "there can be no doubt that [plaintiff] will be a motivated, effective advocate" for the third party's rights. *Powers v. Ohio*, 499 U.S. 400, 413–14 (1991); *see also Utah Chapter of the Sierra Club v. Utah Air Quality Bd.*, 2006 UT 74, ¶ 42, 148 P.3d 960 (a party with standing "has the interest necessary to effectively. . . develop[] and review[] all relevant and legal factual questions" (cleaned up)).

¶194 In other words, a party who can properly assert third-party standing is one of "the most effective advocates of" the third party's rights. *Singleton v. Wulff*, 428 U.S. 106, 114 (1976) (plurality opinion). The close relationship necessary to assert third-party standing means that the plaintiff and the third party are "in every practical sense identical." *NAACP v. Alabama ex rel. Patterson*, 357 U.S. 449, 459 (1958).[48] Because the plaintiff and the third parties

_____

[47] We review a district court's determination of irreparable harm for an abuse of discretion. *See Osguthorpe v. ASC Utah, Inc.*, 2015 UT 89, ¶ 37, 365 P.3d 1201. This court will only set aside a district court's finding of irreparable harm when that conclusion is "so lacking in support as to be against the clear weight of the evidence." *Chen v. Stewart*, 2004 UT 82, ¶ 19, 100 P.3d 1177 (cleaned up), *abrogated on other grounds by State v. Nielsen*, 2014 UT 10, 326 P.3d 645.

[48] If the State's interpretation were accurate, a plaintiff appropriately asserting the rights of third parties would almost never be able to obtain an injunction. This would undermine the

(continued . . .)

it has standing to represent are sufficiently aligned, the harms suffered by either are appropriate considerations in determining irreparable harm.

¶195 The State does not cite any caselaw for the proposition that a court should not consider the harms to third parties when a plaintiff with third-party standing seeks an injunction. This is not surprising since we appear to have not addressed the question directly. But other courts, including the United States Supreme Court, have. Unlike Utah's rule 65A, which uses the term "applicant," federal courts look to the harm to the "movant" or the "moving party." *See, e.g.,* FED. R. CIV. P. 65; *Roberts v. Van Buren Pub. Schs.*, 731 F.2d 523, 526 (8th Cir. 1984); *Rubin v. Young*, 373 F. Supp. 3d 1347, 1351–52 (N.D. Ga. 2019). Federal courts have read "movant" to include a consideration of third-party harms when the moving party meets the requirements for third-party standing.

¶196 The United States Supreme Court, for example, considered harms to third parties in *Roman Catholic Diocese of Brooklyn v. Cuomo*, 592 U.S. 14 (2020) (per curiam). There, the plaintiffs —religious organizations—sought an injunction of a governor's executive order imposing caps on the number of individuals who could attend religious services during a public health emergency. *Id.* at 15–16. To decide whether irreparable harm was present, the Court looked to the injury to non-parties, explaining that "the great majority of those who wish to attend . . . [religious] services . . . will be barred." *Id.* at 67–68.

¶197 In *Innovation Law Lab v. Nielsen*, plaintiffs sought to enjoin "certain actions taken . . . related to immigrant detainees held at the Federal Detention Center in Sheridan, Oregon." 342 F. Supp. 3d 1067, 1071 (D. Or. 2018). Specifically, plaintiffs alleged that these actions violated detainees' Fifth Amendment right to counsel and their statutory rights to legal visitation and phone calls. *Id.* at 1079–81. Concluding that one of the plaintiffs had third-party standing to advocate on behalf of the detainees, the court considered only harms to the third parties, rather than the harms to the plaintiffs

---

purpose of third-party standing—providing an avenue for claims that otherwise might not be heard. *Kowalski v. Tesmer*, 543 U.S. 125, 130 (2004). Accordingly, the term "applicant" under rule 65A cannot be limited to just the plaintiff but must also include third parties that the plaintiff has the ability to represent.

asserting third-party standing. It ultimately concluded that there was irreparable harm solely because of the "likely violati[ons] [of] immigrant detainees' constitutional rights." *Id.* at 1081.

¶198 In *Hellebust v. Brownback*, plaintiffs requested an injunction to prevent the Kansas State Board of Agriculture from conducting elections, alleging that the electoral process violated the Fourteenth Amendment. 812 F. Supp. 1136, 1137 (D. Kan. 1993). To conclude that there was irreparable harm, the court determined that "[t]he plaintiffs, as well as all residents of Kansas . . . will be denied their Fourteenth Amendment rights to vote in this election." *Id.* at 1138.

¶199 And in *Pro-Choice Network of Western New York v. Project Rescue Western New York*, plaintiffs sought to enjoin the defendant "from engaging in an allegedly illegal effort to prevent women from obtaining abortions and other gynecological and family planning services." 799 F. Supp. 1417, 1421 (W.D.N.Y. 1992), *aff'd sub nom. Pro-Choice Network of W.N.Y. v. Schenck*, 67 F.3d 377 (2d Cir. 1995), *rev'd on other grounds*, 519 U.S. 357 (1997). To assess irreparable harm, the *Pro-Choice Network* district court relied on harms to prospective patients, explaining that "women denied unimpeded access to plaintiffs' health care facilities cannot be compensated merely by money damages." *Id.* at 1428.

¶200 We see no reason not to apply that logic to Utah Rule of Civil Procedure 65A. Certainly, the State has articulated no reason why we should not follow the lead of those courts that have allowed a plaintiff with third-party standing to use the harms suffered by those whose rights it seeks to vindicate to support an application for preliminary injunction.

¶201 Looking to the harms PPAU's patients would suffer, the district court properly concluded that PPAU had established irreparable harm. PPAU introduced, among other evidence, three declarations from various professionals discussing the impact of SB 174 on itself and its patients. These declarations attested to the physical, emotional, and financial impact SB 174 would have on women who would be required to carry unwanted pregnancies to term.

¶202 The declarations explained that even "in an uncomplicated pregnancy, an individual experiences a wide range of physiological challenges" and that pregnancy "can also

69

exacerbate preexisting health conditions." The declarants further opined that "[p]regnancy may also induce or exacerbate mental health conditions." (First citing Kimberly Ann Yonkers et al., *Diagnosis, Pathophysiology, and Management of Mood Disorders in Pregnant and Postpartum Women*, 117 OBSTETRICS & GYNECOLOGY 961, 963 (2011); and then citing F. Carol Bruce et al., *Maternal Morbidity Rates in a Managed Care Population*, 111 OBSTETRICS & GYNECOLOGY 1089, 1092 (2008).)

¶203 PPAU's declarations explained that "[s]ome side-effects of pregnancy render patients unable to work," and that "pregnancy-related discrimination can result in lower earnings both during pregnancy and over time." (First citing NAT'L P'SHIP FOR WOMEN & FAMS., BY THE NUMBERS: WOMEN CONTINUE TO FACE PREGNANCY DISCRIMINATION IN THE WORKPLACE 1–2 (2016); and then citing Jennifer Bennett Shinall, *The Pregnancy Penalty*, 103 MINN. L. REV. 749, 787–89 (2018).)

¶204 The declarants predicted that if SB 174 is enforced, Utahns "will be forced either to remain pregnant against their will; [or] go out of state for an abortion." They further discussed that those who travel out of state will "in most instances incur[] significantly greater travel-related expenses and logistical burdens than if they could obtain an abortion in their home state."

¶205 The declarations also detailed the burdens on women who are eligible for one of SB 174's exceptions. For example, when an abortion can be obtained under SB 174 because of a qualifying fetal diagnosis, the paperwork process "is likely to delay access to care and increase the expense and emotional toll of such a diagnosis." And a rape survivor that becomes pregnant "must disclose their identity, personal contact information, and invasive details about the rape" to obtain an abortion under SB 174.

¶206 In addition to the declarations, PPAU provided deposition testimony from a Utah Department of Health and Human Services representative who stated that there has been an "increase in maternal mortality" since 1990 and that "between five and ten women a year . . . die as a complication of pregnancy." PPAU offered evidence that "attempt[s] to obtain an abortion outside of the medical system . . . may in some cases be unsafe," in part because these attempts "may rely on harmful tactics such as herbal or homeopathic remedies, intentional trauma to the abdomen, abusing alcohol or illicit drugs, or misusing dangerous

hormonal pills." (Citing D. Grossman et al., TEX. POL'Y EVALUATION PROJECT, *Knowledge, Opinion and Experience Related to Abortion Self-Induction in Texas* 3 (2015).)

¶207  The district court also considered an *amicus* brief from the American College of Obstetricians and Gynecologists, the American Medical Association, and the Society for Maternal-Fetal Medicine. This brief discussed the increased risk that women will attempt unsafe, self-managed abortions. It additionally stated that "by limiting the maternal life and health exception only to death and 'substantial and irreversible impairment of a major bodily function,'" SB 174's narrow exceptions "fail[] to take into account whether patients experienced issues that threatened their lives or the permanent impairment of a major bodily function during prior pregnancies." They further noted, "Any of these prior conditions can progress or reoccur if abortion care is not available. Various complications that present danger to the health of the pregnant patient also can directly affect fetal development and survival."

¶208 This briefing also examined the safety of abortion procedures, and how childbirth presents a much greater risk of death than abortion. It additionally raised the impact of abortion bans on undermining the physician-patient relationship, by compromising the physician's obligation to act in the "patients' best medical interest." The briefing described this as an "impossible choice" for physicians to balance their own risk of prosecution against the health of their patient and that this "could cause some physicians to second guess the necessity of critical abortion care until the pregnant patient has a serious medical complication or it is too late to save the pregnant patient's life."

¶209  The State provided no evidence to rebut PPAU's showing of harm. On this record, we cannot conclude that the district court abused its discretion when it concluded that PPAU had shown that the injunction would prevent irreparable harm.[49]

_____

[49] It bears noting that PPAU also put evidence before the district court of the harms that it would face as an organization without an injunction. PPAU argued that it was under threat of criminal and licensing penalties if it failed to comply with SB 174. Though not in the context of a preliminary injunction, the United States Supreme Court has held that "a credible threat of prosecution" is sufficient

(continued . . .)

71

*C. The District Court Did Not Abuse Its Discretion When It Determined that the Balance of Harms Weighs in Favor of PPAU*

¶210 The balance of harms prong considers whether the applicant's injury exceeds the potential injury to the defendant. *Cf. Amoco Prod. Co. v. Vill. of Gambell*, 480 U.S. 531, 542 (1987) ("[A] court must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief.").

¶211 The State did not address the balance of harms in its district court brief. The district court nevertheless weighed the State's interest in protecting unborn life as well as the State's interest in enforcing a statute that is presumed to be constitutional.

¶212 At the preliminary injunction hearing, the court stated that, "I assume that the legislature's goal is, . . . rooted in a moral

---

to establish an injury-in-fact sufficient for Article III standing. *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 159 (2014). The Court has also contemplated that an injury-in-fact can be met through threats of "sanctions and perhaps loss of license." *Craig v. Boren*, 429 U.S. 190, 194 (1976).

Relying on this rationale, other federal courts have concluded that the threat of criminal or civil penalties can establish irreparable harm. *See, e.g., VanDerStok v. Garland*, 633 F. Supp. 3d 847, 857 (N.D. Tex. 2022) (finding irreparable harm from the "perceived threat of looming civil and criminal liability" for possibly illegal firearm purchases). For example, in *Longoria v. Paxton*, a federal district court held that irreparable harm could be established from "the chilling effect that arises from the threat of imprisonment and civil penalties" related to a law prohibiting government officials from encouraging "timely vote-by-mail applications." 585 F. Supp. 3d 907, 915, 933–35 (W.D. Tex. 2022), *vacated and remanded on other grounds*, No. 22-50110, 2022 WL 2208519 (5th Cir. 2022). Likewise, in *California Trucking Ass'n v. Becerra*, a federal district court found irreparable harm where the movant "face[d] the risk of governmental enforcement actions, as well as criminal and civil penalties" unless they "significantly transform[ed] their business operations" to treat truck drivers as employees instead of independent contractors. 433 F. Supp. 3d 1154, 1158–59, 1169 (S.D. Cal. 2020), *rev'd on other grounds sub nom. Cal. Trucking Ass'n v. Bonta*, 996 F.3d 644 (9th Cir. 2021).

conviction." The district court noted that many "women are going to obtain [abortion] treatment out of state," that many are "going to use readily available medication," and many women are "going to resort to unsafe means." The court further stated that "I don't have any clear picture of [] whether this Act, which will cause harm, will actually prevent the harm that it was meant to prevent. . . . I'm balancing what is a fairly predictable, a [known] harm, against something that's very unpredictable." The court's written order echoed this conclusion when it explained that "it is unclear on this record whether and to what extent [SB 174] will ultimately further its legislative goals."[50]

¶213 The State challenges the district court's determination in three ways. The State first argues that the court should not have considered PPAU's asserted third-party harms. As we explained, PPAU's third-party standing allows it to point to harms of those third parties whose interests it promotes. *Supra* Part II.B.

¶214 The State next claims that the district court ignored harms to the State that arise from enjoining "statutes enacted by representatives of its people." (First citing *Maryland v. King*, 567 U.S. 1301, 1303 (2012) (Roberts, C.J., in chambers); then citing *N.M. Dep't of Game & Fish v. U.S. Dep't of Interior*, 854 F.3d 1236, 1254–55 (10th Cir. 2017); and then citing *Planned Parenthood of Greater Tex. Surgical Health Servs. v. Abbott*, 734 F.3d 406, 419 (5th Cir. 2013).)

¶215 And the State asserts that it has an interest in enforcing SB 174 unless the law is "likely constitutionally infirm." (Citing *Chamber of Com. of U.S. v. Edmondson*, 594 F.3d 742, 771 (10th Cir. 2010).) It also argues that "legislative enactments are presumed to be constitutional unless the contrary clearly appears." (Quoting *Highland Boy Gold Mining Co. v. Strickley*, 78 P. 296, 297 (Utah 1904), *aff'd*, 200 U.S. 527 (1906).)

---

[50] We review a district court's balancing of harms for an abuse of discretion. *See Osguthorpe v. ASC Utah, Inc.*, 2015 UT 89, ¶ 37, 365 P.3d 1201. We will set aside the court's determination only when it is "so lacking in support as to be against the clear weight of the evidence." *Chen v. Stewart*, 2004 UT 82, ¶ 19, 100 P.3d 1177 (cleaned up), *abrogated on other grounds by State v. Nielsen*, 2014 UT 10, 326 P.3d 645.

¶216  The State is correct that when we consider constitutional challenges to a statute, "we presume the statute to be constitutional, resolving any reasonable doubts in favor of constitutionality." *South Salt Lake City v. Maese*, 2019 UT 58, ¶ 8, 450 P.3d 1092 (cleaned up). But that does not mean that a party cannot overcome the presumption.

¶217  To be sure, the State has an interest in the enforcement of laws enacted by the people's duly elected representatives. But Utahns also have an interest in not having their constitutional rights infringed. Because PPAU demonstrated the existence of serious issues going to SB 174's constitutionality, *see supra* Part II.A, the district court did not abuse its discretion when it looked at the evidence placed before it at the hearing and concluded that the harm to PPAU's patients outweighed the harm to the State's interest in enforcing the law while its constitutionality remains in dispute.

¶218  The State also argues that delaying SB 174's enforcement imposes "a particularly severe irreparable harm on the State" considering its interest in "the preservation of human life, both the mother's and unborn child's." (First citing UTAH CODE § 76-7-301.1(1); and then citing *Dobbs v. Jackson Women's Health Org.*, 597 U.S. 215, 301 (2022).) The State claims that the harm to its interest in "the preservation of human life, both the mother's and unborn child's" outweighs any harm PPAU might suffer. The State correctly points out that the Legislature has long asserted a "compelling interest in the protection of the lives of unborn children." (Quoting UTAH CODE § 76-7-301.1(2).)

¶219 The difficulty for the State on appeal is that PPAU introduced evidence to support its assertions concerning harm. In contrast, the State provided the district court with no evidence to support its claims that SB 174 would further its interests or, conversely, that the injunction would result in any significant harm. The State now asserts that it "did not need to present witness declarations or other fact evidence supporting . . . longstanding State interests in preserving life . . . and the obvious, indisputable, and irreparable loss of life that abortion causes."

¶220   There is no question that the State has asserted an interest in protecting life. *See* UTAH CODE § 76-7-301.1(2). Nor is there any question that the State has an interest in the preservation of human life. The existence of these interests is not in doubt, and we agree

with the State that it did not need to present the district court with evidence to validate these *interests*. But the same cannot be said about the *injury* the State claims those interests would face from the injunction. The State offered the district court no evidence—as opposed to argument—that would have allowed the district court to assess the extent to which the interests SB 174 is designed to promote would be impaired if an injunction issued.

¶221 Not only that, but PPAU presented the district court with evidence contesting SB 174's ability to achieve the legislation's goals. For example, the record contains declarations asserting that some individuals will obtain abortions either outside of the medical system or in other states.

¶222 Similarly, the State argues that SB 174 promotes the health of women. But PPAU introduced evidence that SB 174 threatens to diminish those interests by interfering with physicians' professional obligations. PPAU demonstrated that SB 174 "forces physicians to choose between the ethical practice of medicine— counseling and acting in their patients' best interest—and obeying the law." (Citing AM. MED. ASS'N, *Opinion 1.1.3 - Patient Rights, in* CODE OF MEDICAL ETHICS (2016) ("Patients should be able to expect that their physicians will provide guidance about what they consider the optimal course of action for the patient based on the physician's objective professional judgment.").) As noted above, evidence before the district court described that fear of prosecution could prompt some physicians to delay providing needed medical care until the patient faces a serious medical complication and how this risks the loss of the patient's life.

¶223 Accordingly, on the record developed before the district court, we cannot say that the court abused its discretion or went against the clear weight of the evidence when it concluded that "it is unclear on this record whether and to what extent [SB 174] will ultimately further [the State's] legislative goals" and determined that the balance of harms weighs in PPAU's favor.

*D. The District Court Did Not Abuse Its Discretion When It Determined that a Preliminary Injunction Would Not Be Adverse to the Public Interest*

¶224 The purpose of a preliminary injunction is "to preserve the status quo pending the outcome of the case." *Hunsaker v. Kersh*, 1999 UT 106, ¶ 8, 991 P.2d 67 (cleaned up); *see also Univ. of Tex. v.*

*Camenisch*, 451 U.S. 390, 395 (1981) ("The purpose of a preliminary injunction is merely to preserve the relative positions of the parties until a trial on the merits can be held.").

¶225 The district court determined that the preliminary injunction would not be adverse to the public interest because it would maintain the status quo of women's health treatment as it has been legally permitted for nearly fifty years. The State challenges the court's conclusion, arguing that "the injunction does not *maintain* the status quo; it *changes* the status quo to permit abortions that are illegal under SB 174." The State posits that because *Dobbs v. Jackson Women's Health Organization* "returned the question of abortion back to the citizens of Utah," SB 174 is the status quo. The State further explains its position that the injunction "maintain[s] the status quo—as if *Dobbs* had never been decided" and, therefore, it, in fact, changed the status quo.

¶226 The appropriate time to determine the status quo is "the last uncontested status between the parties which preceded the controversy." *Schrier v. Univ. of Colo.*, 427 F.3d 1253, 1260 (10th Cir. 2005) (cleaned up). The last uncontested status between the State and PPAU existed before SB 174 took effect.

¶227 The State also argues that the district court abused its discretion because it "ignore[d] the compelling State and public interest in preserving the lives of unborn children and mothers." It posits that the district court's decision wrongly "'second-guess[es]'" the Legislature's "'determinations of the public interest.'" (Quoting *Fish v. Kobach*, 840 F.3d 710, 755 (10th Cir. 2016).) To the contrary, the district court explicitly acknowledged the Legislature's declared policy and its interest in protecting unborn life. The district court did not second-guess the Legislature's determinations. It surveyed the evidence presented during the proceedings and determined that, in light of what it had before it, it would not be adverse to the public interest to enjoin the law's enforcement while the parties litigate the serious constitutional issues. On the evidence the parties presented to the district court, we cannot conclude that the court abused its discretion or went against the clear weight of that evidence when it decided that maintaining the status quo would not be adverse to the public interest.

**CONCLUSION**

¶228 PPAU has standing to press its claims and the claims of its patients.

¶229 The district court did not err when it concluded that PPAU had raised serious issues about the constitutionality of SB 174. The court did not abuse its discretion when it concluded that PPAU and its patients would be irreparably harmed without the injunction. Likewise, the court did not abuse its discretion when it concluded that the balance of harms tipped in favor of enjoining SB 174 while the parties litigate its constitutionality. Nor did the court act outside the bounds of its discretion when it concluded that the injunction would not be adverse to the public interest.

¶230 We affirm the district court's decision to enjoin the enforcement of SB 174 while the litigation is pending.

_____

CHIEF JUSTICE DURRANT, dissenting:

¶231 Since our state's founding, we have required that plaintiffs show standing as a threshold matter to bring a case in court.[51] And we have traditionally required that—to meet this threshold—plaintiffs show they have "suffered some distinct and palpable injury that gives [them] a personal stake in the outcome of the legal dispute."[52] Our precedent firmly establishes that this traditional rule safeguards core principles, among them the separation of powers mandated by the Utah Constitution[53] and the integrity and efficiency of the judiciary as a whole.[54]

---

[51] *See, e.g., Welsh v. Lambert*, 54 P. 975, 975 (Utah 1898) (dismissing appeal for lack of standing); *Alpine Homes, Inc. v. City of West Jordan*, 2017 UT 45, ¶ 2, 424 P.3d 95 ("Standing is a question of subject matter jurisdiction that raises fundamental questions regarding a court's basic authority over the dispute." (cleaned up)).

[52] *Jenkins v. Swan*, 675 P.2d 1145, 1148 (Utah 1983).

[53] *See* UTAH CONST. art. V § 1; *id.* art. VIII, § 1; *Utah Transit Auth. v. Loc. 382 of Amalgamated Transit Union*, 2012 UT 75, ¶ 20, 289 P.3d 582; *Brown v. Div. of Water Rts. of Dep't of Nat. Res.*, 2010 UT 14, ¶ 12, 228 P.3d 747.

[54] *See Jenkins*, 675 P.2d at 1149; *Baird v. State*, 574 P.2d 713, 717 (Utah 1978); *Utah Chapter of the Sierra Club v. Utah Air Quality Bd.*, 2006 UT 74, ¶ 20, 148 P.3d 960.

¶232 This traditional rule also imposes a limit on the claims that plaintiffs can bring. Simply put, plaintiffs must show that the injury they suffered justifies the remedy they seek.[55] This generally prevents plaintiffs from claiming they deserve a remedy based on an injury suffered by a third party who is not involved in the lawsuit.

¶233 Our precedent creates few exceptions to this rule, two of which—public-interest standing and third-party standing—are implicated in this case. These exceptions are implicated because of the claims PPAU brings. While PPAU asserts that the enforcement of SB 174 would cause it to suffer various economic and reputational injuries, none of the arguments in its complaint or request for a preliminary injunction rely on those injuries. PPAU's arguments instead are premised on the harms SB 174's enforcement would cause to the rights and interests of PPAU's patients.[56] As the majority agrees, PPAU must show that it has standing to assert these claims on its patients' behalf.[57]

¶234 The district court concluded that PPAU had standing to assert these claims based on the concept of public-interest standing created in *Jenkins v. Swan*.[58] The majority now affirms that decision on different grounds, holding that PPAU may assert these claims based on the concept of third-party standing created in *Shelledy v. Lore*.[59] I respectfully disagree with both conclusions.

---

[55] *See Shelledy v. Lore*, 836 P.2d 786, 789 (Utah 1992) ("The general rule is that a litigant must assert his own legal rights and interests[] and cannot rest his claim to relief on the legal rights or interests of third parties." (cleaned up) (citing *Warth v. Seldin*, 422 U.S. 490, 499 (1975))).

[56] *See supra* ¶ 10 (listing PPAU's claims).

[57] *Supra* ¶ 56.

[58] *See* 675 P.2d at 1150.

[59] 836 P.2d at 789.

Durrant, C.J., dissenting

## I. *Shelledy*'s "Impossibility" Requirement

¶235  In *Shelledy*, we set out a three-factor test to determine when a plaintiff was entitled to claim third-party standing.[60] This test requires plaintiffs to show "first, the presence of some substantial relationship between the claimant and the third parties; second, the impossibility of the rightholders asserting their own constitutional rights; and third, the need to avoid a dilution of third parties' constitutional rights that would result were the assertion of [third-party standing] not permitted."[61]

¶236  The majority holds that PPAU satisfies all three factors.[62] While I do not necessarily agree with the majority's reasoning regarding the first and third factors, my strongest objection is to its treatment of the second. More specifically, I disagree with both how the majority interprets *Shelledy*'s "impossibility" requirement and how it then applies that requirement to the facts of this case.

¶237  In my view, defining "impossibility" is straightforward. The word is commonly used in both legal and lay contexts, and its meaning is the same in both. Something is an impossibility when it "cannot occur, exist, or be done,"[63] when it is "not within the realm of the possible."[64] This definition distinguishes something that is

---

[60] *Shelledy v. Lore*, 836 P.2d 786, 789 (Utah 1992). The majority is unsure of whether *Shelledy*'s language "actually created a three-factor test." *Supra* ¶ 60. I believe that *Shelledy*'s language firmly answers that question. In that case, we held that "a party may assert the constitutional rights of a third party if certain factors are met," and then listed three factors. *Shelledy*, 836 P.2d at 789; *see May*, Black's Law Dictionary (12th ed., 2024) ("To be permitted to[;] . . . . is required to; shall; must.").

[61] *Shelledy*, 836 P.2d at 789 (quoting Note, *Standing to Assert Constitutional Jus Tertii*, 88 Harv. L. Rev. 423, 425 (1974)).

[62] *Supra* ¶ 81.

[63] *Impossibility*, Black's Law Dictionary (12th ed. 2024).

[64] *Impossible*, Webster's Third New International Dictionary (1961); *see also Impossibility*, Webster's Third New International Dictionary (1961) ("[T]he quality or state of being impossible . . . .").

impossible from something that is merely improbable or impractical.[65]

¶238  *Shelledy* requires a plaintiff seeking third-party standing to show "the impossibility of the [third parties] asserting their own constitutional rights."[66] I would read this plainly: the plaintiff must show that it would be impossible for the relevant third parties to come to court themselves.

¶239 Scenarios in which such impossibility occurs can be readily found in cases involving third-party standing. For example, in *Barrows v. Jackson*, a white landowner who sold her property to black purchasers was sued over a racially restrictive covenant in the property's deed.[67] The U.S. Supreme Court allowed the landowner to assert the purchasers' Fourteenth Amendment rights because it was legally impossible for the purchasers to do so themselves; the purchasers weren't being sued, and so hadn't suffered any injury that would give them standing to intervene.[68]

¶240 This straightforward interpretation of "impossibility" also aligns with how the *Shelledy* court applied the test it had just created to the facts of that case. The plaintiff there attempted to assert the rights of the Small Business Administration (SBA), a federal agency.[69] This court determined that the "impossibility" prong of the third-party standing test had not been satisfied because "the SBA has never been precluded from asserting its [own] immune status."[70] This suggests that the *Shelledy* court was defining "impossibility" in line with its common usage; to show that it was impossible for the SBA to assert its rights, the plaintiff

---

[65] *Compare Impossible*, WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY (1961) ("[I]ncapable of being or of occurring . . . ."), *with Improbable*, WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY (1961) ("[U]nlikely to be true or to occur . . . .").

[66] 836 P.2d at 789.

[67] 346 U.S. 249, 251 & n.1, 252 (1953).

[68] *Id.* at 257 (noting that "it would be difficult if not impossible for the persons whose rights are asserted to present their grievance before any court").

[69] *Shelledy*, 836 P.2d at 786–87.

[70] *Id.* at 789.

would have to show that such an assertion had been tried and had failed, or otherwise could not occur.[71]

¶241 In short, the word "impossibility" has a plain meaning. That meaning is well understood, readily applicable to third-party standing cases, and in line with the word's use in *Shelledy*. I don't see a reason why we should craft a different definition.[72]

¶242 The majority disagrees and offers three reasons why we should define "impossibility" to mean (in effect) difficult or unlikely.[73] The majority's first two rationales are premised on a discrepancy between the language of *Shelledy* and the sources that *Shelledy* cited. This is the portion of *Shelledy* at issue:

> The general rule is that a litigant "must assert his own legal rights and interests[] and cannot rest his claim to relief on the legal rights or interests of third parties." *Warth v. Seldin*, 422 U.S. 490, 499, 95 S.Ct. 2197, 2205, 45 L.Ed.2d 343, 355 (1975) (citations omitted). However, a party may assert the constitutional rights of a third party if certain factors are met: "first, the presence of some substantial relationship between the claimant and the third parties; second, the impossibility of the rightholders asserting their own constitutional rights; and third, the need to avoid a dilution of third parties' constitutional rights that would result were the assertion of [third-party standing] not permitted." Note, *Standing to Assert Constitutional Jus Tertii*, 88 Harv.L.Rev. 423, 425 (197[4]) [hereinafter the Note]. *See generally* Henry P. Monaghan, *Third Party Standing*, 84 Colum.L.Rev. 277 (1984); La[u]rence H.

---

[71] *See Preclude*, BLACK'S LAW DICTIONARY (12th ed. 2024) ("[T]o prevent or make impossible . . . .").

[72] *See Textualism*, BLACK'S LAW DICTIONARY (12th ed. 2024) ("The doctrine that the words of a governing text are of paramount concern and that what they fairly convey in their context is what the text means.").

[73] *See supra* ¶¶ 70–73.

Tribe, *American Constitutional Law* § 3-19 (2d ed. 1988).[74]

¶243 The majority's first argument begins by correctly noting that *Shelledy* misconstrued the secondary source from which it pulled its three-factor test.[75] The *Shelledy* court describes the three quoted factors as necessary conditions for third-party standing to be granted,[76] whereas the Note describes them only as "[t]hree considerations, none of which is of controlling significance, [that] seem to recur" in cases where the U.S. Supreme Court has granted a claimant third-party standing.[77]

¶244 While I agree that *Shelledy* misconstrued the Note, I don't believe that misconstruction has any legal effect. Simply put, what matters in an opinion is what this court says, not what the author of a source we cite says. Once we quote words, they exist first and foremost in the context of the opinion, not in the context of their source.[78]

¶245 The majority next argues that, by quoting the Note, *Shelledy* referenced the federal test for third-party standing.[79] And because the federal test requires plaintiffs to show only that there is "some genuine obstacle" to the relevant third parties asserting

---

[74] *Shelledy*, 836 P.2d at 789.

[75] *Supra* ¶¶ 71–73.

[76] 836 P.2d at 789.

[77] Note, *Standing to Assert Constitutional Jus Tertii*, 88 HARV. L. REV. 423, 425 (1974) (cleaned up).

[78] *See Salt Lake City v. Salt Lake City Water & Elec. Power Co.*, 174 P. 1134, 1137–38 (Utah 1918) ("To say that the unexpressed intention of the author controls as against the usual and ordinary meaning of the language is to fly in the face of all rules and canons of construction. To say that a judgment can be made to mean something contrary to the ordinary and usual meaning of the language used . . . would be most dangerous in practice.").

[79] *Supra* ¶ 71 n.14 (describing "the federal cases from which we borrowed the [third-party standing] doctrine").

their own rights, we should interpret "impossible" as carrying that same meaning.[80]

¶246 While I agree that *Shelledy* made references to the federal third-party standing test, I disagree with the notion that *Shelledy* adopted the federal test in any meaningful way. Indeed, the premises of this argument are sufficient to refute it. The fact that *Shelledy* set out a rule that is explicitly different from the federal test seems a clear statement of intent not to adopt the federal test.

¶247 The *Shelledy* court was certainly capable of adopting the federal rule if it had desired to do so. *Shelledy* was written in 1992. In 1991, the U.S. Supreme Court had plainly stated the federal third-party standing test in *Powers v. Ohio*.[81] If the *Shelledy* court had intended to adopt the U.S. Supreme Court's test, they presumably would have expressed that intention by quoting *Powers*. Similarly, the majority in *Shelledy* followed up its citation to the Note with a "*see also*" citation to two other secondary sources.[82] Both sources provide a description of the federal test for third-party standing that doesn't use the word "impossibility."[83]

¶248 *Shelledy*'s drafters were clearly aware that there were different tests for third-party standing. The fact that they chose to use a version of the test that required plaintiffs to show that it was impossible for the third parties to assert their own rights should not, in my view, be construed as inadvertent. And I do not believe we should presume that the *Shelledy* court made a mistake worthy

---

[80] *See supra* ¶ 72 (describing the *Singleton* plurality); *supra* ¶ 58 n.9 (noting that a majority of the Court had since adopted the *Singleton* plurality's position).

[81] 499 U.S. 400, 410–11 (1991) (recognizing third-party standing upon satisfaction of the requirements that "the litigant must have a close relation to the third party; and there must exist some hindrance to the third party's ability to protect his or her own interests" (cleaned up)).

[82] *See* 836 P.2d at 789 (citing Henry P. Monaghan, *Third Party Standing*, 84 Colum. L. Rev. 277 (1984); Laurence H. Tribe, American Constitutional Law § 3-19 (2d ed. 1988)).

[83] *See* Monaghan, *Third Party Standing*, 84 Colum. L. Rev. 277, 288–89; Tribe, American Constitutional Law § 3-19.

of correction simply because they chose a different test than we might prefer.

¶249 The majority's third reason to deviate from a straightforward interpretation of *Shelledy* leans on policy concerns. Specifically, the majority contends that taking "impossibility" at face value would make it easier for a plaintiff to invoke another form of alternative standing—public-interest standing—than to invoke third-party standing.[84]

¶250 As an initial matter, I'm not convinced that the majority's prediction is accurate. Indeed, a review of the past few decades of appellate litigation turns up multiple cases where plaintiffs have sought to claim public-interest standing but none in which plaintiffs have sought to claim third-party standing.[85] Given that plaintiffs already seem to find it easier to satisfy the requirements of public-interest standing, the majority's concerns seem to describe the status quo, not some anomalous future.

¶251 It's also possible that the majority's contemporary concerns are different from those that motivated the *Shelledy* court. Less than a decade before *Shelledy* was published, this court created public-interest standing in *Jenkins v. Swan*.[86] That decision is rife with warnings about the dangers that come with allowing plaintiffs to bring claims that are not their own.[87] Given the continuity of the court's composition between *Jenkins* and *Shelledy*, it does not seem to me that the *Shelledy* court would have been eager to lower the bar for alternative-standing claims.[88]

---

[84] *Supra* ¶ 71 n.14.

[85] *See, e.g., Gregory v. Shurtleff*, 2013 UT 18, 299 P.3d 1098; *ACLU of Utah v. State*, 2020 UT 31, 467 P.3d 832 (per curiam); *supra* ¶ 60 (noting that "[t]his case is our first opportunity to apply this part of *Shelledy*").

[86] 675 P.2d 1145 (Utah 1983).

[87] *Id.* at 1149–50 (explaining why courts exclude claims based on the rights and injuries of third parties).

[88] I believe the fears that were expressed both before and after *Jenkins* are well-founded. Allowing plaintiffs without traditional standing to bring claims jeopardizes many of the judiciary's core

(continued . . .)

DURRANT, C.J., dissenting

¶252 My final concern lies with the degree of difference between the *Shelledy* test laid out in 1992 and the *Shelledy* test the majority employs today. It is true, as the majority notes, that our opinions sometimes refine tests that were set out in previous cases.[89] But changing "impossibility" to "substantial obstacle" strikes me as well beyond a mere refinement. It is not the sort of minor alteration that *stare decisis* permits; it is a departure of sufficient magnitude to amount to an effective overturning of the impossibility prong of the *Shelledy* test.[90] This court has a procedure for overruling its own precedent.[91] Until that procedure is used here, I believe we should treat *Shelledy*'s language as controlling.

### II. PPAU LACKS BOTH THIRD-PARTY STANDING AND PUBLIC-INTEREST STANDING

¶253 When the district court granted PPAU's request for a preliminary injunction, it did so after concluding that PPAU had public-interest standing under the test laid out by *Gregory v. Shurtleff*.[92] The majority now affirms the district court's decision on the alternate ground that PPAU has third-party standing under the test laid out by *Shelledy v. Lore*.[93] I disagree with both holdings.

---

interests and values. *See Shurtleff*, 2013 UT 18, ¶¶ 63–121 (Lee, J., concurring in part and dissenting in part).

[89] *See supra* ¶ 70 n.13 ("[W]e emphasize that refining tests when we apply them is not a novel exercise.").

[90] The majority notes that "the parties briefed the question of how we should interpret *Shelledy*," and "no party suggested that interpreting the word impossibility would require us to overturn the case." *Supra* ¶ 70 n.13. To me it is not surprising that the State found it unnecessary it to make this secondary argument, given that its primary argument was that *Shelledy*'s impossibility prong required a showing of legal impossibility and that "[d]owngrading 'impossibility' to mere discouragement would nullify the general rule that a party cannot assert the constitutional rights of a third party."

[91] *See generally Eldridge v. Johndrow*, 2015 UT 21, 345 P.3d 553.

[92] 2013 UT 18, 299 P.3d 1098.

[93] 836 P.2d 786, 789 (Utah 1992).

¶254 In part this is because, as explained above, I disagree with the majority's interpretation of *Shelledy*'s "impossibility" requirement. PPAU clearly cannot succeed if "impossibility" is given its plain meaning, and indeed PPAU does not argue that it would. But I believe that PPAU lacks standing even under the more lax standard the majority adopts.

### A. PPAU Lacks Third-Party Standing

¶255 Under the majority's definition of "impossibility," PPAU must show that its patients face a "genuine obstacle" to filing suit themselves. To satisfy this requirement, PPAU offers anonymous declarations from patients as "demonstrat[ions] of why patients are unlikely to bring their own suits" challenging SB 174. Each anonymous declarant faces similar issues: "a lack of knowledge, time, and resources; fear of being in court; and fear" of public repercussions for being associated with abortion litigation. The majority references these same declarations to reach its conclusion that "PPAU's patients are sufficiently prevented from asserting their own rights."[94]

¶256 I am sure that the concerns these declarations raise are sincerely felt. But I do not agree that these concerns "sufficiently prevent[]" PPAU's patients from coming to court themselves. Most of my disagreement stems from the question of whether PPAU's patients would, in fact, need to surmount the obstacles they believe are in their way.

¶257 PPAU argues that individual patients are effectively prevented from challenging SB 174 on their own behalf due to the significant time, cost, and expertise that litigating such a high-profile issue requires. While I do not doubt that the parties have invested much time and money in this case, I disagree with the suggestion that an individual plaintiff who challenged SB 174 would have to bear the burden of that litigation alone.

¶258 Because abortion is a monumentally significant legal issue, there are multiple national advocacy organizations, PPAU's parent organization among them, that have both the desire and the means to fully litigate challenges to laws restricting abortion

---

[94] *Supra* ¶ 76.

access.[95] This very case proves the point: PPAU filed a complaint challenging SB 174's validity the day after the law went into effect.[96] This eagerness makes it difficult to imagine that PPAU would choose not to support an individual Utahn who personally challenged SB 174.[97] Indeed, such an individual could resolve the present standing dispute simply by joining this case as a plaintiff alongside PPAU, and in so doing avoid the efforts required to file another lawsuit from scratch. It is hard to argue that an obstacle is insurmountable when it is unlikely that an individual plaintiff would actually be required to surmount it.

¶259 PPAU's declarants also worry about the unwanted publicity they could face as someone challenging an abortion ban. Each of the women who filed a declaration in support of PPAU's suit cited fears of publicity, public shame, and judgment as contributing to their reluctance to challenge SB 174 in their own names. Again, I am sure that these concerns are sincerely held. But, as above, these concerns can be addressed. The easiest way to do so would be by using a pseudonym, which would obscure the plaintiff's identity and shield her from the public eye.

¶260 We have never squarely addressed the criteria for determining when a plaintiff may file a lawsuit under a

---

[95] This situation is not new. The pseudonymous plaintiff in *Roe v. Wade* was solicited as a client by "lawyers looking for a plaintiff to test the constitutionality of Texas's anti-abortion laws." Margaret G. Farrell, *Revisiting* Roe v. Wade*: Substance and Process in the Abortion Debate*, 68 IND. L.J. 269, 282 (1993).

[96] *Supra* ¶¶ 8–9.

[97] A recent press release by the national Planned Parenthood organization shows this concept in action. Taylor Shelton, a South Carolina resident, is the named plaintiff in a lawsuit challenging that state's abortion ban. *South Carolinian Challenges State's Abortion Ban in Court*, PLANNED PARENTHOOD (Feb. 5, 2024), https://www.plannedparenthood.org/about-us/newsroom/press-releases/south-carolinian-challenges-states-abortion-ban-in-court. Ms. Shelton filed the lawsuit jointly with her doctor and Planned Parenthood South Atlantic. *See id.* The plaintiffs are "represented by Planned Parenthood Federation of America" and a South Carolina law firm. *Id.*

pseudonym.[98] But there is good reason to conclude that the use of a pseudonym should be permitted in this case. I would certainly support such a conclusion. Federal courts generally agree that the use of pseudonyms has "implicit recognition" and is appropriate "where there is an important privacy interest to be recognized."[99] It may be that the protections provided by a pseudonym are inadequate to fully resolve PPAU's patients' concerns. But PPAU has not carried its burden of proving that to be so.

¶261 I would also reject this portion of PPAU's standing argument for another reason. The difficulties that PPAU's patients face are genuine, but they are not that different from those faced by many others who wish to challenge a law's constitutionality. Appellate litigation is undoubtedly too expensive, inconvenient, and time-consuming.[100] But if these factors alone are enough to justify the exercise of third-party standing, then we risk a dangerous expansion of that doctrine.

¶262 I believe that the correct interpretation of *Shelledy* requires plaintiffs seeking third-party standing to show that it would be impossible for the relevant third parties to assert their own rights. PPAU cannot satisfy that standard. But even under the majority's

---

[98] *See Gardner v. Bd. of Cnty. Comm'rs*, 2008 UT 6, ¶¶ 52, 56, 178 P.3d 893 (noting that the plaintiff's use of a pseudonym is a matter of first impression and deciding that allowing a plaintiff to use a pseudonym is a decision within the discretion of the district court), *abrogated on other grounds by Utah Res. Int'l, Inc., v. Mark Tech. Corp.*, 2014 UT 59, 342 P.3d 761.

[99] *Lindsey v. Dayton-Hudson Corp.*, 592 F.2d 1118, 1125 (10th Cir. 1979); *see also* Francis M. Dougherty, Annotation, *Propriety and Effect of Use of Fictitious Name of Plaintiff in Federal Court*, 97 A.L.R. Fed. 369 § 8 (1990) (noting the historical use of pseudonyms in abortion cases).

[100] *See, e.g.*, *The Justice Gap: Addressing the Unmet Legal Needs of Lower-Income Utahns*, UTAH BAR FOUNDATION, 1 (Apr. 2020), https://www.utahbarfoundation.org/static/media/UBFJusticeG apFullReport.e99dbe0b776f9580a13f.pdf (listing key findings, including that over "two-thirds of Utah's lower-income survey respondents indicated that they could not afford a lawyer if they needed one").

DURRANT, C.J., dissenting

more lenient standard, PPAU still has not shown that it should be permitted to assert third-party standing on behalf of its patients. Accordingly, I dissent from the majority's reasoning as well as from its conclusion.

*B. PPAU Cannot Claim Public-Interest Standing*

¶263 Though the majority does not reach this issue, I also disagree with the district court's decision that PPAU is entitled to claim public-interest standing. The factors that prevent PPAU from claiming public-interest standing under *Shurtleff* mirror those that prevent it from claiming third-party standing under *Shelledy*. Plaintiffs are entitled to public-interest standing only if they can show, among other things, that "the issue is unlikely to be raised at all if the plaintiff is denied standing."[101]

¶264 As argued above, that simply is not the case here. The sheer importance of this issue makes litigation on SB 174's constitutionality inevitable. And there are multiple ways for that litigation to occur that do not require us to extend either public-interest or third-party standing. The most straightforward avenue would be for one of PPAU's patients either to file her own lawsuit or to join PPAU's.

¶265 Because PPAU has not shown that it is unlikely that another plaintiff would come forward, PPAU is not entitled to claim public-interest standing. And as I would also hold that PPAU should be denied third-party standing, I would overturn the district court's grant of a preliminary injunction.

––––––––––––

[101] *Shurtleff*, 2013 UT 18, ¶ 13 (cleaned up).